### In re WESTINGHOUSE SECURITIES LITIGATION.

**This Order Relates to the Purchaser Class Action.**

#### Civ. A. Nos. 91–354, 91–624.

United States District Court,
W.D. Pennsylvania.

July 27, 1993.

unreasonably delay a decision on any appeal filed by plaintiff.

## TABLE OF CONTENTS

### OPINION AND ORDER

D. BROOKS SMITH, District Judge.

### I. *INTRODUCTION*

Westinghouse Credit Corporation (WCC) is a subsidiary of Westinghouse Financial Services, Inc. (WFSI), itself a wholly-owned subsidiary of Westinghouse Electric Corporation (Westinghouse). WCC was formed in 1954 to finance consumer sales of Westinghouse products; however, it eventually expanded into new credit markets, including industrial and commercial finance and sophisticated corporate lending. In the early 1980s, WCC hit its stride when it tapped into the booming commercial and residential real estate markets.

Such success, however, was short-lived. WCC's fortunes collapsed along with the real estate market in the late–1980s, and the price of Westinghouse stock tumbled during the class period from a high of $39.375/share to a low of $15.875/share. Consolidated Amended Class Action Complaint (Docket No. 84) ¶¶ 185, 186. Now, like so many lending institutions battered by the late–1980s real estate bust, *see* Michael Quint, *Investors Challenging Banks on Bad Loans,* N.Y. Times, January 28, 1991, at D1, Westinghouse, along with its outside accountant and investment bankers, is defending against shareholders who allege that the company made false and misleading statements regarding the health of its financial services units, thereby artificially inflating the price of Westinghouse stock and damaging plaintiffs who purchased that stock at what they claim to have been an artificially high price.

The Purchaser Class Action plaintiffs filed their action on February 28, 1991. Over the course of the next year, the parties skirmished over several discovery motions, until March 18, 1992, when Magistrate Judge Lancaster ordered Westinghouse to make available to plaintiffs, on a continuous basis from April 1, 1992 to April 29, 1992, at WCC's offices, documents relating to 536 accounts designated as "Assets Held for Sale or Restructuring" for inspection and copying. On June 15, 1992, after having reviewed some 3.5 million pages of active investment file documents, plaintiffs filed a Consolidated Amended Class Action Complaint [1] (Complaint) and an Amended and Supplemental Complaint relating to the derivative action against Westinghouse, Civil Action No. 91–624 (Derivative Complaint) (Docket No. 85). This action is currently before the Court on defendants' motions to dismiss (Docket No. 90, 91, 101, 106).

### II. *BACKGROUND*

As noted above, WCC sharply increased its lending activity in the 1980s, expanding into highly leveraged corporate transactions, high-yield securities, and especially, commercial real estate markets. WCC's primary source of funds for these investments was short-term commercial paper debt. When the real estate market softened during the late–1980s and into the early–1990s, many of WCC's real estate receivables began underperforming, and the underlying investment properties lost value. Therefore, on May 8, 1990, in order to protect WCC's standing with the commercial paper ratings agencies, Westinghouse entered into a support agreement with WCC, pursuant to which Westinghouse agreed to maintain for three years, by regular capital infusions if necessary, WCC's total debt-to-equity ratio at a maximum of 6.5 to 1. ¶ 97; Exhibit O to Defendant Westinghouse's Memorandum in Support of Motion to Dismiss Consolidated Amended Class Action Complaint (Westinghouse Memo) at 8.

By September 21, 1990, the Corporate Finance Section of Westinghouse's Treasury Department had prepared a report entitled "Strategic Considerations—WFSI, Discussion Points," Exhibit Y to Westinghouse Memo, which assessed the diminished value

---

1. Plaintiffs' Complaint is 185 pages long, and paragraph numbers 346 through 373 are used twice. Throughout this memorandum, an aster- isk will be used to denote the second set of paragraphs. For example ¶ 346 is on page 127, while ¶ 346* is on page 137.

of WFSI assets and offered direction for WFSI's future plans. ¶ 111. The report, the contents of which were not released to the public, ¶ 112, discussed the various strategies available to WFSI as it faced increasing problems in its real estate portfolio. The alternatives under consideration were stated as follows:

A—maintain size and likely growth, modest change in mix—acquire Enterprise and United, but stop there

B—maintain size, improve growth outlook by aggressive change in mix—fund aggressive growth in thrifts and mortgage banking by liquidating WCC's current business

C—contract size, maintain mix—accept write down, apply proceeds for sale of written down assets to debt repayment, pursue thrifts and mortgage banking on modest scale

D—pay dividend, contract size and growth—aggressively liquidate assets, distribute cash to parent—abandon thrifts and mortgage banking

Exhibit Y at 15. The report speculated that alternatives B and D were unlikely, and raised the possibility of a fifth alternative, the "missing alternative—focus on selling leasehold residuals and other 'hidden' assets to produce gains for write offs, reduce cost structure (internally generated gains used to write off non-earning assets)." *Id.* at 17.

The report suggested that Westinghouse continue to "modify and complete the Strategic Plan" and "complete the Lazard study— evaluate exit vs. hold alternatives." *Id.* at 18. The report concluded, *inter alia,* that it was "unlikely" that WFSI would continue to operate as a long-term, core business, and that it would eventually exit the real estate markets. The report recommended that WFSI hold its portfolios for exit when the markets recovered, and stated that there was "no need for [a] self-inflicted writedown— unless assets can be liberated." Finally, the report recommended "engag[ing] Lazard to [evaluate the costs and benefits of a] near-term exit vs. hold for later exit," and "to assist in internal restructuring effort, and validate Corporate views—also, to assist in communications message." *Id.* at 20.

Westinghouse did retain Lazard Freres & Co. (Lazard), an investment banking firm, on September 28, 1990. ¶ 115. After interviewing key WCC personnel about WCC's real estate portfolios, Lazard allegedly began preparing Westinghouse's CEO and Chairman of the Board of Directors, Paul Lego, for a meeting with securities analysts scheduled for October 24, 1990. ¶ 125. At the October 24, 1990 meeting, Lego allegedly told the analysts: "We believe our reserves are adequate. We see no major problems there," and, "We do not believe we will have to take any kind of major hit in financial services. We believe our reserves are adequate." ¶ 131.

Lazard subsequently informed Westinghouse that:

Markets do not currently expect any major write-off. They rely on a statement by Westinghouse's management, at the October 24, meeting, that there are no prospects of such write-offs. Several reports quote the statement as the source of their belief.... Because it would come as a relative surprise and in contradiction to previous announcements, a large write-off might put the credibility of Westinghouse's management at risk.

¶ 132.

On February 27, 1991, Westinghouse and WCC announced that they were taking a $975 million pre-tax charge against fourth-quarter 1990 earnings as part of a restructuring plan adopted by Westinghouse for its WFSI and WCC subsidiaries. ¶ 150. Westinghouse also made a cash contribution of $525 million to WFSI during the first quarter of 1991 and extended its 1991 support agreement with WCC to June 1994. Exhibit O to Westinghouse Memo at 8.

Also on February 27, 1991, Lego stated in a letter to shareholders: "We believe the loss provision and related actions decisively address the problems at WFSI." Lego concluded that, "By taking this special charge, we have strengthened the financial position of the corporation. The short-term problems we are experiencing in no way detract from the long-term opportunities we see in · our

markets. We remain fully confident of our ability to create outstanding returns to our shareholders over the long term." ¶ 153; Exhibit K to Westinghouse Memo at 6, 8.

Concurrent with the February 27, 1991 press release, Westinghouse and WCC filed with the SEC Forms 8–K, pursuant to Sections 13 or 15(d) of the Securities Exchange Act, which require the periodic filing of reports necessary to keep reasonably current the information and documents contained in a registration statement. 15 U.S.C. §§ 78m, 78o (d) (1988). In its February 27, 1991 Form 8–K, WCC disclosed its identification of "$139 million in real estate properties owned, $653 million in marketable securities, $538 million in non-earning receivables and $1.3 billion in reduced earning receivables[2] restructured to earn less than their original contractual rate." Exhibit L to Westinghouse Memo at 2.

On or about March 11, 1991, Westinghouse and WCC filed annual reports, Form 10–K, for the 1990 fiscal year. Exhibits M and N to Westinghouse Memo. On or about April 18, 1991, and again on or about May 6, 1991, Westinghouse filed with the SEC a registration statement, Form S–3, and Prospectus in conjunction with a May 9, 1991 public offering of 19,000 shares of Westinghouse common stock at $26.50 per share. Exhibits O, P, and Q to Westinghouse Memo.

On October 7, 1991, Westinghouse filed a Form 8–K that announced that net income was down over the first three quarters of 1991 compared to the same period in 1990, and issued another press release announcing "a major change in strategy to accelerate a broader disposition of assets in its financial services subsidiary, resulting in the recording of a $1.68 billion valuation provision during the third quarter." ¶ 179; Exhibit V to Westinghouse Memo at 4. Addressing this second substantial charge against earnings

within 9 months, Lego explained: "Because of the prolonged recession, the lack of credit in real estate markets and the nation's oversupply of commercial properties, which have diminished the current value of real estate assets, we have determined to take these decisive actions." ¶ 181; Exhibit V at 10. Lego also stated: "While disappointing, this performance is the result of the comprehensive plan we announced today that is intended to accelerate the recovery of our Financial Services unit and to put the corporation back on the track toward improved operating and financial performance." Id. at 5.

Finally, on or about November 14, 1991, Westinghouse and WCC filed with the SEC their quarterly reports, Form 10–Q, for the third quarter of 1991. Exhibits W and X to Westinghouse Memo. WCC cited "limited progress ... in liquidating or restructuring real estate and corporate financing assets,"[3] Exhibit X at 9; Westinghouse disclosed that:

> Operating profit for the third quarter and first nine months was down significantly compared with the same periods of 1990. Third quarter operating profit included a $1.68 billion valuation provision established to facilitate the previously announced plans to downsize Financial Services. Excluding the $1.68 billion valuation provision, operating profit for the quarter and first nine months was sharply lower than the same periods of 1990. The decline in operating profit was due to significant increases in loan loss provisions from continuing business operations.

Exhibit W at 11. Westinghouse also announced that it would enter into a new support agreement with WCC, "stipulat[ing] the same financial support with respect to [WCC's 6.5 to 1] debt-to-equity ratio," and providing financial support necessary to guarantee WCC's commercial paper borrowings, and to maintain WCC's debt ratings. Exhibit X at 10.

---

**2.** WCC defines "reduced-earning receivables" as "real estate loans for which principal is expected to be repaid but which earned less than the original contractual rate during the last month in the period for which financial information is presented." Exhibit S to Westinghouse Memo at 14. "Usually, reduced-earning loans have been

modified or restructured because of financial difficulties of the borrower." Id.

**3.** $595 million of WCC's marketable securities, mostly high-yield corporate debt securities, were sold during the first nine months of 1991. Exhibit X to Westinghouse Memo at 15, 25.

## III. *DISCUSSION OF THE COMPLAINT*

### A. *Westinghouse Allegations*

Plaintiffs' causes of action against Westinghouse include claims for violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934, as amended (the Exchange Act), 15 U.S.C. §§ 78j(b), 78t (1988), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1992)[4]; Sections 11, 12(2), and 15 of the Securities Act of 1933, as amended (the Securities Act), 15 U.S.C. §§ 77k(a), 77*l* (2), 77*o* (1988)[5]; and for negligent misrepresentation under principles of Pennsylvania common law.[6] Plaintiffs allege that as early as 1988, defendants were aware of the serious deterioration of WCC's real estate and highly-leveraged transactions portfolios, but as set forth in more detail in Part V, *infra*, failed to: (1) fully disclose the extent of the losses in the receivables, attempting to hide those losses; (2) make appropriate valuation provisions to the loan loss reserves established to cover the nonperforming or underperforming receivables; and (3) disclose the effect of the losses upon Westinghouse's and WCC's commercial paper ratings and on Westinghouse in light of Westinghouse's financial obligations to WCC under the support agreement. ¶ 46.

### B. *The Secondary Defendant Allegations*

Plaintiffs also allege causes of action under Section 10(b), Section 11, Section 12(2), and common law negligent misrepresentation against Price Waterhouse, Westinghouse's independent accountant, Lazard, an investment banking firm retained in September 1990 to advise Westinghouse, and several securities underwriters (including Lazard) who underwrote Westinghouse's May 1991 public offering of common stock.

The first substantive mention of the secondary defendants appears at ¶ 48. Price Waterhouse and Lazard are alleged generally to have "aided" Westinghouse, WCC, and the individual defendants in concealing the deteriorating condition of WCC's real estate loans during the March 28, 1989 through October 22, 1991 period. The factual specifics concerning this aid are distributed among ¶¶ 53, 56 and 64: Price Waterhouse and Lazard are alleged to be responsible for WCC's publication of artificially reduced levels of nonearning real estate receivables in WCC's Forms SEC 10–Q and Forms 10–K. Price Waterhouse and Lazard also aided the Westinghouse defendants in some undescribed way in reclassifying nonearning real estate as reduced earning receivables. Price Waterhouse is additionally alleged to have failed to disclose WCC's portfolio of underperforming real estate receivables after auditing WCC's 1988 and 1989 financial statements, and to have authorized Westinghouse's announcement of its 1990 unaudited financial results on January 17, 1991.

Next, in ¶ 77 through ¶ 90, Price Waterhouse is alleged to have audited Westinghouse's and WCC's year-end statements in 1989, 1990 and 1991 and received fees from Westinghouse for doing so. Price Waterhouse is alleged to have assisted Westinghouse and WCC at unspecified times to conceal WCC's losses and risky loans in three ways: (1) by agreeing that WCC's reserve for loan losses would not exceed 2.5% of receivables; (2) by failing to disclose WCC's reclassification of nonearning receivables as reduced earnings receivables, WCC's growing volume of reduced earning receivables, and WCC's in-substance foreclosures; and (3) by misrepresenting that Price Waterhouse's audits were consistent with Generally Accepted Accounting Standards (GAAS) and that Westinghouse and WCC's financial statements were prepared in accordance with Generally Accepted Accounting Principles (GAAP). In 1990, Price Waterhouse is alleged to have informed WCC management of its reluctance to remain at a 2.5% level of reserves, and approved an increase to a 2.8% level of reserves. Plaintiff alleges that Price Waterhouse misrepresented this level of reserves as adequate, despite knowing at year-

---

4. Count One at ¶¶ 407–422.

5. Counts Two through Five at ¶¶ 423–466.

6. Count Six at ¶¶ 467–471.

end 1990, facts demonstrating that the level of reserves was deficient by $1 billion or more.

Plaintiffs' allegations then turn, in ¶ 103 et seq., to Lazard. Lazard is alleged to have been retained by Westinghouse as a financial adviser in August or September 1990; to have conducted a study of WFSI and WCC; and to have produced a document entitled Westinghouse Credit Corporation—Discussion Outline. Exhibit B to Underwriter Defendants' Compendium of Exhibits (Compendium).

Lazard partners Felix Rohatyn and Kenrick Wilson allegedly prepared Lego and Warren H. Hollinshead, Westinghouse's Treasurer and CFO, for an October 24, 1990 meeting with securities analysts. Lazard executive Steve Niemczyk is alleged to have written a script containing proposed answers to questions expected from the securities analysts, which script included two statements actually made by Lego at the October 24, 1990 analysts' meeting:

> We believe our reserves are adequate. We see no major problems there.... We do not believe we will have to take any kind of major hit in financial services. We believe our reserves are adequate.

Compendium, Exhibit A at 7.

Plaintiffs allege that these statements were false and that the Lazard personnel responsible knew or recklessly disregarded facts which demonstrated that the statements were false. ¶ 131.

Lazard allegedly continued to analyze WCC's status in December 1990 and January 1991, and learned of WCC's deteriorated asset values, high levels of nonearning receivables, and the inadequacy of WCC's reserves. Construing an ambiguity in the complaint most favorably to the plaintiffs,[7] plaintiffs also allege that at the time of the January 16, 1991 earnings report Westinghouse had already planned the charges it later took against 1990 income, ¶ 138, and that Lazard learned of this plan by January 9, 1991. ¶ 136. On January 9, 1991 Lazard allegedly recommended that Westinghouse release fourth-quarter and year-end 1990 earnings results on January 16, 1991 without disclosing any of these facts. Lazard also allegedly recommended a board meeting to discuss a restructuring of WFSI and WCC, a meeting which took place on January 30, 1991.

Plaintiffs allege that Westinghouse personnel met with personnel from Lazard and Shearson Lehman Brothers on February 7, 1991 to discuss the effect on the ratings of Westinghouse commercial paper of an "expected charge to earnings." ¶ 143. In response to Westinghouse's request, Lazard completed a document on February 11, 1991 entitled Model Restructuring and Financial Plan which proposed, *inter alia,* a $1.0–$1.2 billion charge to increase loan loss reserves. ¶ 145.

Westinghouse and Lazard allegedly determined to seek the rating agencies' reaction to the proposed charge, ¶ 147, and on February 20, 1991, Lego and other Westinghouse personnel met with Moody's and Standard and Poor's. The plan submitted by Westinghouse differed in several respects from the Model Plan prepared by Lazard. ¶ 148.

On February 27, 1991, Westinghouse announced its $975 million charge against 1990 earnings. Allegedly Lazard and Price Waterhouse knew this "did not provide for adequate reserves," and "chose to conceal the losses" with a "crash effort to sell off the losing real estate loans and properties." ¶ 155. Lazard allegedly also prepared a document for use at the February 27, 1991 board meeting entitled Westinghouse Electric—Board Meeting Q & A, and which read as follows:

Q: Are the reserves adequate?

A: Given the results of each of these review processes, the charge taken today is clearly reasonable but was at the low end of the range identified by management in conjunction with the strategic review performed by Lazard.

---

7. Plaintiffs allege in ¶ 136 that as of January 1991, Westinghouse was planning to take a single charge, presumably the February 1991 charge; in ¶ 138 plaintiffs allege that Westinghouse was planning "charges to 1990 income." (Emphasis added).

The charge taken is clearly based on economic conditions today. Given the unstable environment in which we are currently operating, further economic deterioration could lead to future charges and further capital calls on the parent.

Furthermore, the level of charge taken today is also highly contingent on the implementation of disposition strategies, which continue to be developed, and on market conditions. It is based on an understanding of how management will deal with underperforming assets: An orderly but aggressive liquidation plan.

In this regard, a timely and active monitoring of the ongoing restructuring/disposition plan is crucial. Not a monthly process, but weekly.

Q: When do we need to see "real" results?

A: By the end of the second quarter following the charge, meaningful results should be evident.

A timely reduction in commercial paper through application of cash proceeds raised via asset dispositions;

A progressive reduction in the level of underperforming assets; and

Stable to increasing core earnings and ROE.

Q: What happens in the event there is further deterioration?

A: More draconian steps would be required to preserve credit ratings at a cost to current earnings. But to the extent that WCC's asset disposition strategy, or its ability to term out additional debt, can reduce commercial paper in the near term, there will be less of a risk due to further economic deterioration an/or [sic] a drop in credit ratings. The key is clearly what can be done in the near-term prior to any further deterioration. ¶ 157.

In April and May of 1991, Westinghouse proceeded with another facet of its restructuring plan, a public offering of 19 million shares of common stock. Westinghouse filed a prospectus and registration statement with the SEC in connection with the offering which took place on May 9, 1991. The prospectus stated that the financial statements incorporated by reference in the prospectus were incorporated "in reliance on the report of Price Waterhouse." ¶ 168; Exhibit Q to Westinghouse Memo at 18. The public offering was apparently completed before the fall of 1991. On September 6, 1991, Moody's and Standard & Poor's downgraded Westinghouse's commercial paper. ¶ 178. In response, Westinghouse took an additional $1.68 billion charge to add to its reserve for loan losses. ¶ 179.

Plaintiffs allege that as early as October, 1990, Lazard and Price Waterhouse knew that the conditions which Westinghouse gave in October 1991 as reasons for its additional charge existed. ¶ 182. Plaintiffs allege that Lazard and Price Waterhouse also knew facts in February 1991 that should have caused them to conclude that the first charge was grossly inadequate. *Id.* Lazard and Price Waterhouse nonetheless allegedly aided Westinghouse in taking the $975 million charge by representing that it was adequate to cover losses inherent in WCC's portfolio, which resulted in the share prices of the May, 1991 offering not reflecting the true financial weakness of the company. ¶ 183, ¶ 185.

Plaintiffs also allege that in connection with public documents and SEC filings Price Waterhouse made knowing or reckless misrepresentations by falsely stating that Westinghouse and WCC's internal controls were adequate, ¶ 351, ¶ 371*, when in fact Price Waterhouse knew, ¶ 355, that they were not. Allegedly, WCC lacked standards for reporting, *inter alia*, in-substance foreclosures, ¶ 356, cash-flow projections, ¶ 357, internal valuations, ¶ 358–60, and lending policies. ¶¶ 369–73.

Plaintiffs contend that Price Waterhouse also falsely stated that the financial statements accompanying the Annual Reports accurately represented WCC's financial position, ¶ 192, ¶ 347*, and that Price Waterhouse's audits of those statements were conducted in accordance with GAAS. ¶ 192, ¶ 351*, ¶ 365*.

According to plaintiffs, Price Waterhouse on January 23, 1991 also was aware that WFSI had identified $2.6 billion in underperforming assets, but nonetheless stated that it

believed WFSI's loss reserves for 1990 were adequate. ¶ 360*, ¶ 361*.

Additionally, Price Waterhouse was retained by Westinghouse in August, 1990 to act as CFO for Brad Cable. WCC provided $10 million to effect a leveraged buyout of Brad Cable in September, 1990. Allegedly, Price Waterhouse's inventory of Brad Cable revealed shortfalls which were covered by WCC. ¶¶ 297–99. Acting as CFO of Brad Cable at the same time Price Waterhouse was auditing Westinghouse's financial statements allegedly rendered Price Waterhouse unable to conduct an independent audit of Westinghouse, ¶ 405, thereby resulting in Price Waterhouse accepting incorrect information from WCC. ¶¶ 374–403.

The allegations summarized above are the basis for the following causes of action against the secondary defendants:

Count One—In ¶ 409, Price Waterhouse and Lazard are alleged to have violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder by making "statements, described above [which] were false and misleading when made." The general reference to statements is understood to refer to the specific statements alleged in the body of the complaint, which are again summarized in ¶ 413.

Count Two—In ¶ 429 and ¶ 430, Price Waterhouse, Lazard and the underwriter defendants are alleged to have violated Section 11 of the Securities Act in connection with the May, 1991 public offering, by participating in the making of false statements in the registration statement, prospectus, and documents incorporated therein. The references to false statements made or true statements not made are understood to refer to the specifics alleged in the body of the complaint, and are summarized in ¶¶ 431–433, and in ¶ 434 as to Price Waterhouse only.

Count Three—Lazard and the underwriter defendants are alleged, in ¶ 442, to have sold Westinghouse common stock in the May 1991 offering through the use of a false or misleading registration statement and prospectus in violation of Section 12(2) of the Securities Act.

Count Four—Price Waterhouse is alleged to have violated Section 11 of the Securities Act in the same manner alleged in Count Two, towards the persons who purchased Westinghouse common stock directly through Westinghouse's dividend reinvestment plan. ¶ 452.

Finally, in Count Six, Price Waterhouse, Lazard and the underwriter defendants are alleged to have committed the tort of negligent misrepresentation by failing to disclose Westinghouse's lack of adequate reserves and by affirmatively representing that Westinghouse's loss reserves were adequate and that Westinghouse's book value accurately reflected its financial condition. ¶ 469.

## IV. PLEADING STANDARDS

### A. Rule 12(b)(6)

▇▇ When deciding a motion to dismiss for failure to state a claim under Fed. R.Civ.P. 12(b)(6), the Court must accept as true all facts alleged in the complaint, and view them in the light most favorable to the plaintiff. *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984). In order to prevail on a Rule 12(b)(6) motion, the movant must establish that no relief could be granted under any set of facts that the plaintiff could prove. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

▇▇ Where the allegations of the complaint rest on the construction placed on a document, it is proper to refer to that document at the pleadings stage to determine whether the document can bear the construction placed on it. *See Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); *Teagardener v. Republic–Franklin Inc. Pension Plan,* 909 F.2d 947, 949 (6th Cir.1990), *cert. denied,* 498 U.S. 1027, 111 S.Ct. 678, 112 L.Ed.2d 670 (1991); *Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

## B. *Rule 9(b)*

Fed.R.Civ.P. 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Under Rule 9(b), a plaintiff must plead

> (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.

*Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 284 (3d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) (citing *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 99 (3d Cir.1983)).

■ Under Rule 9(b), plaintiffs may not simply point to a bad result and allege fraud. Rather, plaintiffs must plead with particularity the circumstances of the alleged fraud in such a way as to inject "precision and some measure of substantiation into their allegations of fraud." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). By way of example, allegations of "who, what, when, where, and how: the first paragraph of any newspaper story," would satisfy the particularity requirement of Rule 9(b). *See Dileo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *cf. Seville Industrial Machinery,* 742 F.2d at 791 (allegations of "date, place or time" fulfill the requirements of Rule 9(b)).

■ This stringent particularity requirement, which applies to allegations of securities fraud, *Recchion v. Westinghouse Electric Corp.,* 606 F.Supp. 889, 894 (W.D.Pa.1985), serves three purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations." *Fox v. Equimark Corp.,* 782 F.Supp. 295, 298 (W.D.Pa.1991) (citations omitted).

The United States Court of Appeals for the Third Circuit has cautioned against permitting "sophisticated defrauders to successfully conceal the details of their fraud." *Christidis,* 717 F.2d at 99–100. Therefore, courts sometimes relax the rule when "factual information is peculiarly within the defendant's knowledge or control," *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989); but a plaintiff who makes such allegations must still provide a "statement of the facts upon which the allegations are based." *Id.*

■ Finally, Rule 9(b) permits "knowledge and other condition of mind of a person [to be] averred generally." Therefore, plaintiffs need not plead intent to defraud with stringent particularity to permit the inference that the defendants are accused of possessing the requisite scienter to state a cause of action for fraud. *Cramer v. General Telephone & Electronics Corp.,* 582 F.2d 259, 272–73 (3d Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).

## C. *Section 10(b)*

■ Section 10(b) of the Exchange Act provides: "It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (1981). SEC Rule 10b–5, promulgated under authority of Section 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact" such that prospective purchasers or sellers of securities are misled. 17 C.F.R. Section 240.10b–5 (1992). To state a claim under Section 10(b) and Rule 10b–5, a private plaintiff must plead (1) a false representation of (2) a material (3) fact; (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it; (5) the plaintiff's reasonable reliance on defendant's false representation; and (6) the plaintiff's

resultant economic loss. *Lewis v. Chrysler Corp.,* 949 F.2d 644, 649 (3d Cir.1991). Individual defendants may be held liable under Section 10, pursuant to Section 20 of the Exchange Act, if the plaintiff can establish the individual defendants' "controlling person" relationship to the defendant corporation.

### D. *Section 11*

■ To bring a claim under Section 11 of the Securities Act, a plaintiff must allege that he "acquired" a security which was accompanied by a registration statement, "any part" of which "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a) (1988). Plaintiffs need not allege reliance, scienter or damages, *see* Louis Loss, *Fundamentals of Securities Litigation* 896–97, 902 (2d ed. 1988), though they must allege that the shares they purchased are traceable to a false or misleading registration statement. *Shapiro,* 964 F.2d at 286.

### E. *Section 12(2)*

■ Section 12(2) of the Securities Act provides that a person who "offers or sells" newly issued securities "by means of a prospectus or oral communication" that misrepresents or omits a material fact "is liable to the person purchasing such security from him" in an initial offering. 15 U.S.C. 77*l* (1988). As with Section 11, plaintiffs need not allege scienter on the part of the defendant, nor must they allege their own reliance on the misstatement or omission. However, in order to state a claim under Section 12(2), plaintiffs must allege that they did not know of the defendants' untruth or omission, and that the defendants knew, or in the exercise of reasonable care, could have known of the misrepresentation or omission. *See Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 687–688 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

### F. *Aiding and Abetting*

■ Plaintiffs allege that Price Waterhouse and the underwriter defendants are liable both for their independent violations of the securities laws and as aiders and abettors of Westinghouse's violations. Complaint ¶ 422. The two theories asserted must be considered separately and distinctly, because aider and abettor liability should properly focus on the connection between the alleged conduct of Westinghouse and the alleged conduct of the secondary defendants, not on the relationship between the plaintiff class and the secondary defendants. Only if Price Waterhouse, Lazard, and the other underwriters are alleged to have knowingly or recklessly participated in Westinghouse's allegedly fraudulent actions in a substantial way can they be properly held as aiders and abettors. *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 799–800 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Landy v. FDIC,* 486 F.2d 139, 162–63 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The direct liability claims against the accountant and underwriters, by contrast, require examination of the communication or nondisclosure of information by the accountant and underwriters to the plaintiffs. Here, whatever is alleged to have been done or not done by Westinghouse must not be conflated with the allegations against the secondary defendants.

## V. COUNT ONE

### A. *Westinghouse's Alleged Financial Misrepresentations*

*1. "Westinghouse and WCC Wrongfully Deflated Their Reported Nonearning Assets and Concealed Reduced Earning Receivables"*

Plaintiffs allege that Westinghouse and WCC manipulated their aggregate nonearning receivables [8] accounts in order to report artificially low levels of nonearning receivables in WCC's SEC quarterly and annual reports. ¶¶ 49–56. The effect of this alleged

---

**8.** "Nonearning receivables" or "non-earning assets" are defined as "[l]oans on which accrual of interest has been suspended because collectibility is doubtful." American Institute of Certified Public Accountants, *Audits of Finance Companies* 103 (1988).

manipulation would be to overstate the quality of the receivables portfolio, thereby deceiving the investing public into believing that those portfolios were more valuable (i.e., had a higher expected future cash flow) than they actually did. ¶¶ 194–198.

Specifically, plaintiffs allege that Westinghouse and WCC systematically deleted certain assets from the nonearning receivables category during the last month of each quarter. Nonearning loans were allegedly restructured, ¶ 204, and transferred to the unreported "less-than-carry," or, more conventionally, "reduced-earning" receivables category. ¶ 205. Plaintiffs allege that this concealment scheme enabled Westinghouse and WCC to create the appearance that they "were justified in recognizing income on those receivables when such recognition was wholly unwarranted." ¶ 205.

Plaintiffs similarly allege that WCC routinely "restructured and modified" the loans of defaulting borrowers "to earn less than their original contract interest rates" in order "to avoid the disclosure and required recognition of substantial losses on these loans." ¶¶ 57–60. In this manner, plaintiffs aver, WCC increased its internally recorded reduced earning receivables account by approximately $1 billion. ¶ 62. The effect of these loan restructurings was to mislead "the marketplace into the belief that WCC's problem loans were limited to the reported but artificially deflated nonearning receivables, which amounted to only 5–7% of WCC's net real estate receivables portfolio," when in reality, by plaintiffs' calculations, WCC's "problem real estate loans" constituted "as much as 60% of its real estate loan portfolio." ¶ 63.

Defendants argue that restructuring loans for defaulting borrowers is "a perfectly reasonable business practice," not inconsistent with GAAP, and that plaintiffs' concealment theory is "entirely conclusory, with no allegations regarding specific loans or deviations, much less material deviations, from generally accepted accounting principles." Westinghouse Memo at 21. Defendants also contend that those specific accounts that plaintiffs have identified and alleged to be part of the concealment scheme, ¶¶ 207–245, constitute such a small portion of the 536 accounts for which plaintiffs have had discovery (an even smaller portion of all Westinghouse assets) as to be immaterial. Westinghouse Memo at 32; *see also* Appendix 1.

Plaintiffs' allegations with respect to defendants' manipulation of non-earning and reduced earning receivables do not satisfy the pleading standards under Section 10(b) of the Securities Act and Rule 9(b). Plaintiffs repeatedly claim that defendants' lacked a "basis" or "reasonable justification" for restructuring nonearning loans and reclassifying them as reduced earning loans. ¶¶ 207–245. But these allegations amount to no more than a dispute over the accuracy of defendants' accounting practices, or a challenge to Westinghouse's opinion and belief as to when collectibility on the loans became doubtful, neither of which constitutes an actionable claim. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977) (internal corporate mismanagement not actionable under § 10(b)); *In re Scott Paper Securities Litigation,* 138 F.R.D. 56 (E.D.Pa.1991) (allegation that a projection was issued without a reasonable basis and therefore actionable "must contain facts that if proved would substantiate the charge of lack of a reasonable basis") (citing *Craftmatic,* 890 F.2d at 645).

Plaintiffs obviously attempt to allege more than simple internal corporate mismanagement, and paint a picture of asset manipulation in the service of nondisclosure. Plaintiffs claim that Westinghouse and WCC attempted to conceal nonearning receivables by restructuring and improperly reclassifying them as reduced earning receivables, and that defendants knew or should have known this was inconsistent with reasonable accounting practices. This is an allegation that, if properly made, would significantly influence the reasonable investor, *Shapiro,* 964 F.2d at 281. However, without an explanation of *how* defendants' actions violated Generally Accepted Accounting Principles, plaintiffs' allegation is conclusory rather than factual, and therefore insufficient under the particularity requirements of Rule 9(b). *See Shapiro,* 964 F.2d at 284–85; *Christidis,* 717 F.2d at 100. To the extent plaintiffs' claim

rests on defendants' alleged restructuring and reclassifying certain accounts, without more, defendants' motion to dismiss plaintiffs' claim under Section 10(b) and Rule 10b–5 is meritorious.

Whether or not defendants' restructurings and reclassifications were justified or made with sufficient basis, defendants still had a duty to disclose the fact and effects of the restructurings and reclassifications. Plaintiffs' allegation that defendants failed to so disclose, *see e.g.,* ¶¶ 198, 211, 213, 216, 219, 223, 229, 238, 240, 242, directly concern the "philosophy of full disclosure," *Santa Fe,* 430 U.S. at 477, 97 S.Ct. at 1303, embodied in the federal securities laws, and withstands defendants' motion to dismiss. Specifically, plaintiffs allege that Westinghouse and WCC failed in several Form 10–Ks and 10–Qs to (1) report their aggregate troubled debt restructurings, and (2) disclose the amount of interest that would have been earned if its restructured loans had been performing in accordance with their original terms, and the amount of commitments defendants made "to lend additional funds to debtors owing receivables whose terms have been modified in troubled debt restructurings." ¶¶ 197–98. Under Financial Accounting Standards Board (FASB) Statement No. 15, this information should have been disclosed, and defendants do not dispute that it was not disclosed. Plaintiffs' allegation is pled with sufficient particularity, as it states when and where the omissions were made, and how defendants failed to comply with GAAP. This claim withstands defendants' motion to dismiss.

2. *"Westinghouse and WCC Concealed Real Estate Foreclosures and Losses Through Special Arrangements with the Tontis"*

Plaintiffs' allegations regarding WCC's "joint venture" with Edmond and Robert Tonti, ¶¶ 65–76, 330–42, are similar to their allegations that defendants concealed non-earning receivables by reclassifying them as reduced earning receivables. WCC allegedly restructured nonperforming commercial real estate loans in such a way that, in economic substance, WCC, and not the Tontis, was the owner of the underlying property in a kind of "joint venture" arrangement. In form, however, this alleged "joint venture" was characterized as an ordinary receivable investment, permitting WCC to understate its joint venture portfolios. ¶¶ 330–340. In this manner, plaintiffs aver, Westinghouse and WCC also avoided reporting losses and taking write-downs on collateral which was in-substance foreclosed, and the "effect ... was to materially inflate the earnings, assets and net worth of Westinghouse and WCC during the Class Period...." ¶ 342.

Plaintiffs' allegations of fraud are derived from the Tontis' own allegations in an action brought against Westinghouse in another district to prevent Westinghouse from enforcing loan obligations, ¶ 65.[9] As such, it is more akin to hearsay than the type of *facts* that must accompany plaintiffs' allegations "indicating why the charges against defendants are not baseless." *Craftmatic,* 890 F.2d at 646.

A more serious flaw in this claim is that it primarily alleges mismanagement. A fraud allegation based upon failure to disclose a devalued asset base, or failure to timely foreclose in substance upon devalued property is inadequate unless it explains the wrongfulness of defendants' course of action. Plaintiffs do not allege why under GAAP the Tonti properties should have been foreclosed rather than recognized as possible income. Similarly, plaintiffs baldly state but do not allege how, under GAAP, the economic substance of the restructured loans compels the conclusion that WCC actually entered into a joint venture with the Tontis. Making additional commercial real estate loans at below market rates to a struggling debtor who "rarely invested any capital in the [underlying] properties," ¶ 70, is risky, may be wrongheaded, may even be gross mismanagement, but it is not fraudulent. *Shapiro,* 964 F.2d at 283 (improper loan collateralization and insufficient loan management prac-

9. *Creekwood Property Corp., et al. v. Westinghouse Credit Corp.,* Civil Action No. 92–109 (District of New Mexico).

tice not actionable under securities laws). Tacking the phrase "in order to conceal losses" onto the end of such an allegation does not convert it from an allegation of mismanagement into a fraud claim any more than does "inserting the words 'defendants failed to disclose that …' before the claimed mismanagement." *Fox v. Equimark Corp.*, 782 F.Supp. at 301.

### 3. *"Westinghouse and WCC Misrepresented the Adequacy of Their Loan Loss Reserves"*

When "[i]t is probable that as of the date of the financial statements," one or more future events will occur confirming that the value of "an asset has been impaired or a liability incurred, based on information available before the actual issuance date of the financial statements," and "the amount of loss can be reasonably estimated," the loan loss reserve [10] established for that asset should be "accrued as a charge to income as of the date of the financial statements." *See* Martin A. Miller, *GAAP Guide 1992* 6.02– 6.03 (1992). If the loss appears only "reasonably possible" or "remote," as of the date of the financial statements, GAAP requires that the loan loss reserve be disclosed by footnote, or not disclosed at all, respectively. *Id.*

Plaintiffs allege that "Westinghouse and WCC failed to follow Generally Accepted Accounting Principles in setting their loan loss reserves," by failing to "make estimates of specific losses whenever possible, using optimistic assumptions in estimating certain losses, and bas[ing] their overall loss reserves not on a loan-by-loan analysis but on historical benchmark percentages of total loans outstanding, which was inappropriate…." ¶ 249. These failings allegedly caused Westinghouse and WCC to misrepresent the adequacy of loss reserves for WFSI in several of its SEC reports, registration statement and prospectus during the proposed class period. ¶¶ 250–263.

In ¶¶ 250–257, plaintiffs allege that Westinghouse and WCC "knowingly or recklessly misrepresented in the Notes to the Financial Statements … the adequacy of [their] loss reserves" in their Form 10–Ks and 10–Qs during the period covering the last quarter of 1988 through the second quarter of 1991. Each of the allegedly misleading statements from those SEC reporting forms represents essentially that: (1) Westinghouse or WCC maintains an allowance for possible losses on financing receivables; (2) at a level which provides adequately for future losses that may develop in the portfolio; (3) which allowance or reserve is "based on historical trends" and "past chargeoff experience," "current delinquencies, the characteristics of the accounts, the value of the underlying collateral and general economic conditions and trends." *See* ¶¶ 252–257; Exhibit N to Westinghouse Memo at 21.

Plaintiffs also aver that the defendants' misrepresentations in their SEC reports were exacerbated by individual Westinghouse officials. In particular, plaintiffs point to the October 24, 1990 statement made by Westinghouse Chairman Paul Lego to a gathering of securities analysts allegedly mischaracterizing WFSI's reserves as "adequate," ¶¶ 258–59, and to a statement by another Westinghouse spokesman, in June 1991, allegedly responding to statement by George Fraise, a market analyst for Smith Barney, that a $500 million write off for Westinghouse was "very possible" by saying: "Our position on that is that we believe that we have taken an adequate reserve, and at this time we don't believe that any further reserve is necessary." ¶ 262.

■ Since the late–1980s, federal courts in the northeast region of the United States, where the downturn in real estate markets has been especially severe, have become familiar with Section 10(b) claims alleging loan loss reserve misrepresentations, and the law

---

**10.** Loan loss reserves are defined in the banking trade as a "statement of condition, or balance sheet, account set up by a bank based on its expectations about future loan losses. As losses occur, they are charged against this reserve. That is, the loan account is credited and the reserve account is debited. The reserve is estab-

lished by a debit to an expense account called the loan loss provision, with a corresponding credit to the loan loss reserve." American Bankers Association, *Banking Terminology* 215 (1989), *quoted in Shapiro v. UJB Financial Corp.*, 964 F.2d at 281.

in this area is well-developed. The mere fact that loan loss reserves are discovered, *ex post*, to be inadequate, does not provide the basis for a securities fraud claim. *Shapiro*, 964 F.2d at 283 ("it is not a violation of the securities laws to simply fail to provide adequate loan loss reserves; properly collateralize or secure a loan portfolio; or provide sufficient internal controls or loan management practices"). However, where the defendant has commented on the

"nature and quality of the management practices that it has used to reach a particular statement of loan loss reserves,"

or has otherwise

"characterize[d] loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully."

*See Shapiro*, 964 F.2d at 281–82.

Westinghouse, through spokesmen and in its SEC reports, undeniably used such language to describe its loan loss reserves, *see e.g.*, Exhibit M to Westinghouse Memo at 42 ("The financial statements were prepared in accordance with generally accepted accounting principles appropriate in the circumstances. . . ." "We believe that the Corporation's policies and procedures, including its system of internal accounting controls, provide reasonable assurance that the financial statements are prepared in accordance with the applicable securities laws and with a corresponding standard of business conduct"), which, *under Shapiro* would put its loan loss reserves "in play."

### a. *Scienter*

 If a corporation's agents' projections or opinions with respect to data such as loan loss reserves are reasoned and justified, with a sound factual or historical basis, they are not actionable even if inaccurate. *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). However, when such opinions are "issued without a genuine belief or reasonable basis," are made knowingly or recklessly, *and* are inaccurate, *see Virginia Bankshares Inc. v. Sandberg*, 498 U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929, 948 (1991) ("disbelief or undisclosed motivation, standing alone, [is] insufficient to satisfy the element of fact" in a securities fraud action), they constitute "culpable conduct actionable under § 10(b) and Rule 10b–5." *Eisenberg*, 766 F.2d at 776 (citations omitted). The issuer's alleged recklessness in issuing the baseless opinions or projections is sufficient to establish the scienter element of a Section 10(b) claim. *Id.* at 777.

Where the corporate director or officer has "greater access to information or [ ] a special relationship to investors making use of the information, there is an obligation to disclose data indicating that the opinion or forecast may be doubtful." *Id.* at 776 (citations omitted). However, management does not have a duty to paint a dark picture of its mismanaged operations, so long as a "reasonably detailed account of past operations and complete financial statements" are disclosed. *See Craftmatic*, 890 F.2d at 640 (affirming dismissal of claims that management failed to characterize "its financial reporting and accounting controls as inadequate and ineffective").

Defendants argue that the loan loss reserves allegations cannot support a cause of action, because the allegedly necessary loss reserves were not established for many individual accounts until Westinghouse abandoned its hold for the long term strategy on February 27, 1991. Westinghouse alleges that prior to that time the adequacy of WFSI's and WCC's loan loss reserves was properly determined primarily by analyzing past chargeoff experience and historical trends, though defendants' SEC reports purport that other, more individualized factors were considered as well. In addition, defendants say, Westinghouse and its subsidiaries truly believed its representations regarding the adequacy of their loan loss reserves, and unless plaintiffs can allege facts showing otherwise, plaintiffs' claims are not actionable.

Loan loss reserves are a type of "soft information," consisting essentially of predic-

tions about the future performance of receivables portfolios. As such, characterizations of reserves as adequate are necessarily a matter of opinion and belief. *Shapiro,* 964 F.2d at 281 ("No matter what method is used, the economic judgments made in setting loan loss reserves can be validated only at some future date"). Such characterizations can be both material, *see Virginia Bankshares,* 498 U.S. at ——, 111 S.Ct. at 2757, 115 L.Ed.2d at 944; *Flynn v. Bass Bros., Inc.,* 744 F.2d 978, 988 (3d Cir.1984), and factual, for "conclusory terms in a commercial context are reasonably understood to rest on a factual basis . . . and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements." *Virginia Bankshares,* 498 U.S. at ——, 111 S.Ct. at 2758, 115 L.Ed.2d at 946.

■ Plaintiffs have alleged the lack of reasonable basis for failure to take loss reserves in the individual cases with sufficient particularity to put defendants on notice of the nature of plaintiffs' claim. Defendants' argument that plaintiffs are merely quibbling over one of at least two proper methods of establishing reserves for commercial real estate under GAAP, Westinghouse Memo at 34, loses some force under the combined weight of standards promulgated by the American Institute of Certified Public Accountants,[11] and the Third Circuit Court of Appeals' opinion in *Bradford–White Corp. v. Ernst & Whinney,* 872 F.2d 1153 (3d Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989) (upholding jury finding that auditor who claimed to comply with generally accepted auditing standards but did not was liable under Rule 10b–5), and

would be a matter more properly raised on a motion for summary judgment.

### b. *Materiality*

Plaintiffs discuss six particular accounts and list seven others in WCC's commercial real estate portfolio, alleging that even though each of the accounts was underperforming no reserve was established. *See Di-Leo,* 901 F.2d at 626; *Fox v. Equimark Corp.,* 782 F.Supp. at 300 (in order to state an actionable claim under the securities laws, the plaintiff must specify how the defendant knew its reserves were inadequate or why it should have increased its reserves earlier). Plaintiffs contend that defendants failed to establish reserves for these accounts without reasonable basis, and that that constitutes fraud.

■ Still, to survive a motion to dismiss, Rule 9(b) requires that a plaintiff plead a specific false representation of a *material* fact. *See Christidis,* 717 F.2d at 99. Applying the Supreme Court's definition of materiality in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to trade shares of the corporation's stock. "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

---

**11.** The AICPA provides:

2.67. Receivables from consumer loans usually are evaluated in total rather than on the basis of individual loans because they consist of large volumes of relatively small balances. In such situations, it is more difficult to judge collectibility of specific loans than to evaluate collectibility of portfolios taken as a whole.... Ratio analyses, historical statistics, current aging conditions, and other general trends are particularly important in evaluating collectibility.

2.68 Many commercial loans are tailor-made and relatively large. The size and uniqueness of commercial receivables necessi-

tates a greater focus on specific loans and problems than is required for more homogeneous direct cash loans and retail sales contracts. Thus, *auditing procedures in connection with commercial lending tend to place less emphasis on statistical data and historical trends and focus more on current collateral values,* industry concentration, and financial conditions of individual borrowers. Particular attention should be given to loans in economically distressed industries.

American Institute of Certified Public Accountants, *Audits of Finance Companies* 31–32 (1988). (Emphasis added).

■ The adequacy of loan loss reserves is the type of information that would significantly influence a reasonable investor, *Shapiro*, 964 F.2d at 281. But the legal materiality of a fact does not turn solely upon the *type* of information that fact represents. Materiality has both a qualitative and a quantitative dimension. If a particular fact alleged is relevant in terms of the sort of information that investors care about, i.e., information concerning the management and financial position of a corporation, but trifling as a matter of consequence, the information is not legally material. The failure to disclose that a loan portfolio is likely to be impaired by some *de minimis* amount may be "relevant" in that it is the type of information that investors care about, but of such "dubious significance," *TSC Industries*, 426 U.S. at 448, 96 S.Ct. at 2132, as to be "trivial," and "hardly conducive to informed decisionmaking," *id.* at 448–49, 96 S.Ct. at 2132, so that to reasonable shareholders, such omission must be immaterial as a matter of law.

■ Instantly, plaintiffs cite examples of problem loans for which WCC allegedly should have, but did not, establish reserves, from periods including the fourth quarter of 1989 through the fourth quarter of 1990. Using plaintiffs' *highest* suggested numbers, the total dollar amount of reserves plaintiffs allege were wrongfully not established for each quarter represents a miniscule portion of WCC's current assets [12] for that quarter.

For example, plaintiffs allege that, during the fourth quarter of 1989, Westinghouse should have reserved between $10 million and $25 million to cover expected losses on its loan to Focus Financial Group Inc., ¶ 277, and an unspecified substantial amount to cover expected losses on its non-recourse first mortgage on the Daniel Building, an office building in Greenville, South Carolina. ¶ 283. Westinghouse's financial statement in its Form 10–K annual report for the fiscal year ended December 31, 1989 represented current assets [13] of $6,779,000,000. Assuming that the reserves plaintiffs allege defendants should have established during the fourth quarter of 1989 totalled $31 million, the reserves would have represented only 0.46 percent of Westinghouse's current assets for the same period. Similar calculations for successive quarters yield percentages of 0.21% for the first quarter of 1990,[14] 1.06% for the second quarter of 1990,[15] 0.24% for the third quarter of 1990,[16] and 1.28% for

12. Plaintiffs challenge defendants' utilization of "total assets" rather than "current assets" in defendants' discussion of materiality and in the appendices to the Westinghouse Memo. *See* Plaintiffs' Memorandum at 66–67. Viewing all allegations in a light most favorable to the non-movants, comparing defendants' alleged failure to establish loss reserves for particular loans to current assets is a more accurate indicator of materiality.

"Current assets" may be defined as:
Economic resources of an entity that are in the form of cash and those that are reasonably expected to be sold, consumed, or converted into cash during the normal operating cycle of the business or within one year if the operating cycle is shorter than one year. Typical items included among current assets include cash, temporary investments, accounts and notes receivable, inventory, and prepaid expenses. In the balance sheet, current assets are usually listed in the order of their liquidity. . . .
Glenn G. Munn, F.L. Garcia, Charles J. Woelfel, *Encyclopedia of Banking and Finance* 238 (9th ed. 1991).

13. The Court accepts as an accurate statement of Westinghouse's current assets in its SEC Form 10–K reports, "Westinghouse's 'Total Current As-

sets' plus WFSI's 'Cash and Short–Term Investments' and 'Marketable Securities'." *See* Notes to Appendix 2 of Westinghouse Defendants' Reply Memorandum in Support of Motion to Dismiss Consolidated Amended Class Action Complaint (Westinghouse Reply Memo).

14. Total reserves allegedly wrongfully not established in the amount of $10,200,029. *See* Hunt Energy loan ($4.5 million), ¶ 288, Oakhaven loan ($1,120,542), Windsong loan ($4,418,439) and Woodlake loan ($161,048), ¶ 290. Westinghouse current assets calculated at $4,936,000,000.

15. Total reserves allegedly wrongfully not established in the amount of $54,800,000. *See* Focus loan ($40 million), ¶ 277, La Jolla Village loan ($8 million), ¶ 279, and ECJV loan ($6.8 million), ¶ 389. Westinghouse current assets calculated at $5,161,000,000.

16. Total reserves allegedly wrongfully not established in the amount of $12 million. *See* Flagship loan (estimate of $10 million is four times the reserve Westinghouse recommended establishing in October, 1990, and represents a "substantial" reserve on a $60 million loan secured by $33 million in mortgages and $18 million in

the fourth quarter of 1990.[17] In fact, by the end of the fourth quarter of 1990, all the loan loss reserves that plaintiffs allege should have been established, *added together*, amounted to only 3.0% of Westinghouse's current assets at that time.

Given these small numbers, it would seem doubtful that plaintiffs have alleged facts showing a *material* misrepresentation or omission, especially since they have had the benefit of conducting discovery on some 536 loan files *before* filing their amended complaint.

▮▮▮ However, the focus on loan loss reserves as a percentage of current assets is misplaced. When it appears "probable" (as opposed to "reasonably possible" or "remote") that an asset has been impaired by an amount that can be reasonably estimated, the previously established loss reserve, or "loss contingency," should be treated as an actual loss. At that point, the proper accounting response is to accrue the loss reserve as a charge against income as of the date of the financial statements. FASB, Statement of Financial Accounting Standards, No. 5 at ¶ 8. What is affected most immediately by the development of a loss reserve for accounting purposes is income, not assets. In order to determine the materiality of allegedly inadequate loan loss reserves, the focus then must be the amount of loan loss reserves alleged to have been wrongfully not posted as a percentage of income during the relevant period, rather than as a percentage of current assets. *See Securities and Exchange Comm'n v. Shared Medical Systems Corp.,* 1992 WL 208029 n. 5 (E.D.Pa.1992) (rejecting defendants' argument that an absolute rule of 10 percent defines materiality in securities fraud cases, and considering effect of alleged misstatement on income).

▮▮▮ In 1989, Westinghouse had net income of $922 million, of which $270 million was earned in the fourth quarter. Exhibit L

to Westinghouse Memo at 9. Westinghouse's 1990 net income, unadjusted for the February 27, 1991 $975 million pretax charge against 1990 fourth quarter earnings, was $1,001,000,000. After the charge, Westinghouse's 1990 net income was $268 million. Westinghouse's unadjusted 1990 fourth quarter net income was $284 million. After the charge, Westinghouse experienced a 1990 fourth quarter net loss of $449 million. Exhibits K and M to Westinghouse Memo at 7 and 22 (1990 Form 10–K.)

Plaintiffs have identified $26 million and $76,442,237 in loan loss reserves wrongfully not established for the fourth quarters of 1989 and 1990. These amounts represent 9.6% of reported 1989 fourth quarter income, and 26.9% of 1990 fourth quarter income (unadjusted), respectively. For the 1990 fiscal year, plaintiffs have identified $153,442,-237 of reserves that they allege should have been posted. These amounts represent approximately 15% of Westinghouse's 1990 net income, unadjusted for the February 27, 1991 charge against 1990 fourth quarter earnings.

At the motion to dismiss stage of litigation, doubts about materiality should be resolved in favor of the non-movant. *See TSC Industries, Inc.,* 426 U.S. at 450, 96 S.Ct. at 2132. With that in mind, and without deciding the applicability of Item 103 of the Securities and Exchange Commission's Regulation S–K, 17 C.F.R. § 229.103 (requiring disclosure of extraordinary legal proceedings involving claims exceeding 10 percent of current assets), to actions for allegedly misrepresented loan loss reserves, the Court believes that plaintiffs' specific allegations of wrongfully understated reserves are sufficiently substantial, in relation to Westinghouse's net income for the relevant time periods, to be deemed legally material.

c. *"Bespeaks Caution"*

▮▮▮ I stated above that defendants' representations in their SEC reports, and in

---

first mortgage liens), ¶ 281, and Great Meadow Gardens loan ($2 million reserve recommended in September, 1990 was allegedly never posted), ¶ 286. Westinghouse current assets calculated at $5,094,000,000.

**17.** Total reserves allegedly wrongfully not established in the amount of $76,442,208. *See* Focus

loan ($59 million as of December 31, 1990), ¶ 277, Great Meadow Gardens loan ($3 million on December 31, 1990), ¶ 286, Marsh Pointe loan ($1,328,208), Friendly Ice Cream loan ($6,700,-000), Tracor loan ($5,750,000) and Woodcreek loan ($590,000), ¶ 290. Westinghouse current assets calculated at $5,955,000,000.

public statements by Westinghouse officials, would, *ceteris paribus,* put the adequacy of defendants' loan loss reserves "in play," in which case plaintiffs have pled their claims with sufficient particularity and materiality to withstand defendants' motion to dismiss. *See* ¶¶ 246–290. However, when Westinghouse's and WCC's statements about the adequacy of their loan loss reserves are considered *in toto, see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d at 47 ("when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC"), it is apparent that the statements are not misleading.

Defendants did not, as plaintiffs' allegations suggest, tender to the investing public only confident statements of fact that Westinghouse and WCC's loan loss reserves were adequate and without risk of future increase. Rather, in their annual and quarterly reports filed with the SEC, defendants consistently hedged their statements of belief about the adequacy of Westinghouse and WCC loan loss reserves, and the prospects of future operations, with qualifying remarks transparent enough to raise red flags for even the least sophisticated investor. For example, after noting the February 27, 1991 special provision for losses charged against 1990 fourth quarter earnings, the Management Discussion and Analysis section of Westinghouse's 1990 Form 10–K annual report warned:

> Management expects earnings for the first quarter of 1991 to be approximately 50% lower than the comparable period in 1990, because of lower operating profit due to deteriorating economic conditions and reduced non-recurring income. Second quarter earnings are expected to be higher than the first quarter, but significantly lower than the second quarter of 1990. . . .
>
> For the remainder of the year, it is difficult to predict the depth and duration of the current economic downturn and the effects of the current worldwide economic and political uncertainty, particularly in the area of the Persian Gulf, on the econo-

my and, consequently, on corporate performance. Assuming no further deterioration in the Corporation's markets, the second half of 1991 is expected to outperform the comparable period of 1990.

Exhibit M to Westinghouse Memo at 17. Referring specifically to the adequacy of loan loss reserves, the report stated:

> Management believes that, under current economic conditions, the allowance for losses at December 31, 1990 will be adequate to cover future losses that may develop in the various portfolios. However, no assurance can be given that a further or more prolonged downturn in the economy will not have a negative effect on the ability of borrowers to repay and on asset values generally.

*Id.* at 19. WCC's 1990 Form 10–K contained almost identical language. *See* Exhibit N to Westinghouse Memo at 4, 9.

In its Form S–3 Registration Statement, filed with the SEC on or about April 18, 1991 in preparation for a public offering of common stock, Westinghouse disclosed that:

> The $3.4 billion in higher-risk and underperforming assets reclassified as held for sale or restructuring [pursuant to Westinghouse's restructuring plan announced on February 27, 1991] included $2.4 billion in receivables. As such, these receivables had and continue to have a high probability of becoming non-earning assets during the expected period of liquidation. Although changes in these assets between earning, reduced earning, non-earning or real estate owned have occurred since December 31, 1990, management does not believe that such changes have had a material effect on the net realizable value of these receivables.
>
> At March 31, 1991, WFSI's valuation allowances related to assets held for sale or restructuring, and the allowances for credit losses related to the assets in the ongoing portfolio, amounted to $1,013 million and $306 million, respectively. Management believes that under current economic conditions such allowances should be adequate to cover future losses that may occur. However, a further or more prolonged downturn in the economy or in the

real estate, securities or certain other markets could have a negative effect on the ability of WFSI's borrowers to repay and on asset values generally and could result in additional increases in non-earning assets, restructured loans and, ultimately, increases in allowances for losses in both assets held for sale or restructuring and receivables in the balance of WFSI's portfolio.

Exhibit O to Westinghouse Memo at 8, 9.

On or about May 14, 1991 and, Form 10–Q, August 14, 1991, Westinghouse and WCC filed quarterly reports for the first and second quarters, respectively, of 1991. Exhibits R, S, T and U to Westinghouse Memo. Westinghouse stated:

Management believes that under current economic conditions, [WFSI's valuation] allowances should be adequate to cover future losses that may occur. However, a further or more prolonged downturn in the economy or in the real estate, securities or certain other markets could have a negative effect on the ability of WFSI's borrowers to repay and on asset values generally, and could result in additional increases in nonearning assets, restructured loans and, ultimately, increases in allowances for losses in both assets held for sale or restructuring and receivables in the balance of WFSI's portfolio.

Exhibit R to Westinghouse Memo at 8. WCC's Form 10–Q also cautioned that:

The majority of receivables held for sale or restructuring are underperforming. Results of sale and restructuring activities related to these receivables were not material for the quarter because implementation of the downsizing plan began late in the quarter. Although management intends to liquidate these assets over the next three years, declining liquidity in credit markets may affect management's ability to achieve the desired results. Furthermore, Westinghouse Credit may be required to continue to provide financing for certain of these assets, either to existing borrowers to restructure loans or to new borrowers to finance the sale of real estate properties.

Nonearning assets at March 31, 1991 included $261 million due from companies that have filed for bankruptcy. A continued downturn in the economy and certain markets served by borrowers may have an effect on the ability of some borrowers to comply with their agreements. This could result in additional increases in nonearning receivables, restructured loans and credit losses.

Exhibit S to Westinghouse Memo at 13, 15; Exhibit U to Westinghouse Memo at 16.

Westinghouse further disclosed that:

Management expects earnings for the second half of 1991 to be down 25% or more from the 1990 second-half results,

and that

[t]he decline in operating profit [for the first six months of 1991] was due to significantly higher levels of nonearning and reduced earning receivables and a reduction in gains from sales of equity interests in financing transactions. The markets, particularly commercial real estate, served by Financial Services are expected to remain depressed over the last six months of 1991 causing the results to be down, with the possibility of an operating loss, compared with the same period of 1990.

Exhibit T to Westinghouse Memo at 10, 11.

With respect to WFSI's loan loss reserves, Westinghouse stated that:

Management believes that under current economic conditions, [WFSI's] allowances should be adequate to cover future losses that may occur. A further or more prolonged downturn in the economy or in real estate, securities, or certain other markets could have a negative effect on the ability of WFSI's borrowers to repay and on asset values generally, and could result in additional increases in nonearning assets, restructured loans and, ultimately, increases in allowances for losses in both assets held for sale or restructuring and receivables in the balance of WFSI's portfolio.

*Id.* at 12.

In its Form 10–Q report for the second quarter of 1991, WCC disclosed that although "Management believes that the revised strategy will reduce portfolio risk and

improve Westinghouse Credit's future financial position", [a] lack of liquidity in the markets in which Westinghouse Credit's customers operate is a continuing concern. Also, a further or more prolonged downturn in these markets or in the economy could have a negative effect on the ability of borrowers to repay and on asset values generally, and could result in increased credit losses." Exhibit U to Westinghouse Memo at 9–10.

Similarly, after noting that nonearning assets included $186 million due from companies that had filed for bankruptcy, WCC warned that "[a] continued downturn in the economy and certain markets in which Westinghouse Credit's customers operate may have an effect on the ability of some borrowers to comply with their agreements. This could result in additional increases in nonearning receivables, restructured loans and credit losses." *Id.* at 16.

■■■ These remarks, far from being Pollyanish, pointed to still darker clouds on the horizon if the economy generally, and real estate markets specifically, did not improve. It was common knowledge that the likelihood of a prompt rebound in commercial real estate markets was not great during 1990 and 1991, and the reasonable investor would be doubly forewarned after reading Westinghouse's and WCC's SEC reports. Furthermore, the professional securities analyst, who is not easily bamboozled by elliptic references to adverse contingencies, would surely take notice of Westinghouse's disclosures. These professional analysts are generally the first and foremost source of information to the market; their specialized ferreting activity is the primary means by which capital markets are made "efficient," and stock prices relatively accurate. *See generally,* Ronald J. Gilson and Reinier H. Kraakman, *The Mechanisms of Market Efficiency,* 70 Va.L.Rev. 549, 569–79 (1984); *cf. Basic Inc. v. Levinson,* 485 U.S. 224, 241–45, 108 S.Ct. 978, 988–90, 99 L.Ed.2d 194 (1988); *Peil v. Speiser,* 806 F.2d 1154, 1160–63 (3d Cir.1986) (citing market efficiency as basis for adopting "fraud on the market" theory of reliance in securities fraud actions). Plaintiffs do not allege that they actually read any of Westinghouse's public disclosures, but are instead relying on the alleged fraud on the efficient securities market practiced by Westinghouse. Plaintiffs cannot simultaneously claim that the market participants who at the margin make the market efficient by sophisticated analysis of available information would have naively overlooked Westinghouse's cautions.

Accordingly, despite sufficient allegations of scienter and materiality, defendants' alleged misrepresentations about the adequacy of Westinghouse and WCC loan loss reserves were so strongly qualified by clear warnings about the future that plaintiffs' causes of action based on the averments in ¶¶ 246–90, except ¶ 258 and ¶ 262, must be dismissed under the "bespeaks caution" doctrine. This doctrine has been expressly adopted by the courts of appeals for the First, *see Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 (1st Cir.1991), Second, *see Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986), Sixth, *see Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991) and Eighth Circuits, *see Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 949 F.2d 243, 245–46 (8th Cir.1991), and by at least one district court in the Ninth Circuit, *see In re Worlds of Wonder Securities Litigation,* 814 F.Supp. 850 (N.D.Cal.1993), one in the Fifth Circuit, *see Porter v. Shearson Lehman Bros. Inc.,* 802 F.Supp. 41, 57 (S.D.Tex.1992), and two district courts in the Third Circuit, *see In re Goodyear Tire & Rubber Co. Securities Litigation,* 1993 WL 130381 (E.D.Pa.1993); *In re Donald J. Trump Casino Securities Litigation,* 793 F.Supp. 543, 552–53 (D.N.J.1992). As stated by the court in *In re Donald J. Trump Casino Securities Litigation,* "adequate cautionary language ... is the equivalent of full disclosure pertaining to forecasts and predictions, relieving defendants of securities fraud liability, [and] plaintiffs' claims are not actionable. In essence, the 'bespeaks caution' analysis would subsume or obviate the analysis regarding adequate allegations of falsity or misrepresentation." *Id.* at 552. Put another way, defendants' statements concerning the adequacy of Westinghouse's loan loss reserves cannot have been made recklessly, as they were accompanied by sufficiently detailed warnings with respect to future contingencies. *Id.* at 553 (discussing

"bespeaks caution" doctrine in light of *In re Craftmatic Securities Litigation*).

■ The cause of action based on the allegations in ¶¶ 258 and 262, shall not be dismissed. Lego's October 24, 1990 statement ("We believe our reserves are adequate. We see no major problems there"), and the unidentified Westinghouse spokesman's unqualified statement on June 24, 1991 contradicting Smith Barney securities analyst George Fraise's opinion about the necessity of another write-off in 1991 lacks the "bespeaks caution" language running through Westinghouse's and WCC's SEC reports.

4. *"Westinghouse and WCC Overstated Net Receivables and Understated Real Estate Owned"*

■ Plaintiffs allege at ¶¶ 291–349 that, throughout the proposed class period, defendants (1) carried as receivables real estate investments that should have been considered foreclosed in substance and therefore accounted for as real estate owned, and (2) misrepresented the value of real estate owned by carrying such assets at the outstanding amounts due under the secured loans, rather than at the fair (market) value of the underlying property—all in violation of GAAP. In this manner, plaintiffs aver, Westinghouse and WCC knowingly or recklessly misrepresented their net receivables and real estate owned in several SEC annual and quarterly reports. ¶¶ 294, 295, 311–17.

Defendants contend that plaintiffs have not stated actionable claims with respect to five of eight properties that allegedly should have been foreclosed in substance, and that the three other properties, ¶¶ 324–29, involve dollar amounts so small as to be immaterial. Defendants raise the same immateriality argument in response to plaintiffs' allegations that Westinghouse overstated net receivables in ¶¶ 330–42. Westinghouse Memo at 34–39; Westinghouse Reply Memo at 21–25.

Defendants argue that "[r]eflecting the difference between the original loan amount and the fair value by adjusting a valuation allowance rather than 'writing down' the asset is an entirely appropriate, and, indeed, correct procedure." Westinghouse Memo at 34–5 (citing American Institute of Certified Public Accountants, *Statement of Position, Accounting for Foreclosed Assets* 92–3 ¶ 12 at 9, Exhibit H to Westinghouse Memo.[18] The provision of the AICPA Statement of Position cited by defendants does not support their argument. The sentence quoted by defendants prescribes that the deficiency between (a) the fair value of foreclosed assets held for sale minus estimated cost to sell and (b) the cost of foreclosed assets held for sale, be recognized as a valuation allowance. The language quoted by defendants does not even address the difference between the original loan amount and the fair value of underlying property, let alone provide a proper method of accounting for it. In fact, the preferable accounting procedure for actual or in substance foreclosures is to carry the asset at its fair value, and recognize the difference between fair value and the recorded investment in the receivable as a loss against net income. FASB, *Statement of Financial Accounting Standards No. 15* at ¶¶ 28, 35.

However, FASB Statement No. 15 also "recognizes that creditors use allowances for uncollectible amounts. Thus, a loss from reducing the recorded investment in a receivable may [be] recognized before the restructuring by deducting an estimate of uncollectible amounts in measuring net income and increasing an appropriate valuation allowance. If so, a reduction in the recorded investment in the receivable in a troubled debt restructuring is a deduction from the valuation allowance rather than a loss in measuring net income for the period of restructuring." *Id.* at ¶ 35. Under GAAP,

---

18. After foreclosure, foreclosed assets held for sale should be carried at the lower of (a) fair value minus estimated costs to sell or (b) cost. Such determination should be made on an individual asset basis. If the fair value of the asset minus the estimated costs to sell the asset is less than the cost of the asset, the deficiency should be recognized as a valuation allowance. If the fair value of the asset minus the estimated costs to sell the asset subsequently increases and the fair value of the asset minus the estimated costs to sell the asset is more than its carrying amount, the valuation allowance should be reduced, but not below zero. Increases or decreases in the valuation allowance should be charged or credited to income. (footnotes omitted)

then, creditors may in fact recognize fluctuating asset values by adjusting valuation allowances, and need not *necessarily* write down assets, though that appears to be the preferred course. Accordingly, the causes of action based on ¶¶ 318–323 which allege only failure to write down assets, will be dismissed for failure to state a claim.

5. *"Westinghouse and WCC Overstated Net Income and Asset Values"*

Plaintiffs' allegations regarding net income and asset values in ¶¶ 343–49 are not independent, particular allegations of wrongdoing. Rather, these paragraphs represent the total effect of their previous allegations upon Westinghouse and WCC's financial statements, which allegations the Court has addressed, *supra.*

B. *Westinghouse's Alleged Misrepresentations Regarding the Adequacy of Its Internal Controls*

In ¶¶ 350–73, plaintiffs aver that, throughout the proposed class period, Westinghouse and WCC misrepresented (by overstating) the quality of their internal controls. Defendants' representations about their internal controls were made in their SEC Form 10–K annual reports, and consisted of the following statement:

> The Corporation maintains a system of internal accounting controls, supported by adequate documentation, to provide reasonable assurance that assets are safeguarded and that the books and records reflect the authorized transactions of the Corporation. Limitations exist in any system of internal accounting controls based upon the recognition that the cost of the system should not exceed the benefits derived. Westinghouse believes its system of internal accounting controls, augmented by its corporate auditing function, appropriately balances the cost-benefit relationship.
>
> \* \* \* \* \* \*
>
> We believe that the Corporation's policies and procedure, including its system of internal accounting controls, provide rea-

sonable assurance that the financial statements are prepared in accordance with the applicable securities laws and with a corresponding standard of business conduct.

Exhibit M to Westinghouse Memo at 42.

Plaintiffs also allege liability based on two statements by William A. Powe, Westinghouse's Executive Vice President and the CEO of WFSI and WCC until October, 1991, which were published in WCC's 1988 and 1989 annual report in the "Message to Security Holders." The statement in the 1988 report assures investors that WCC management had "strengthened the Company's evaluation and monitoring of credit and portfolio risks;" the 1989 report states that WCC had given "particular attention to monitoring the quality and performance of the Commercial real estate financing portfolio, and ... made strategic changes to take advantage of market conditions." ¶¶ 352–53.

Finally, in Complaint ¶¶ 355–73, plaintiffs aver that, sometime prior to August 1990,[19] WCC management received from an anonymous WCC employee a tip that WCC's internal accounting controls were not adequate to ensure the reliability of their reported financial condition. WFSI internal auditors conducted their own investigation, and submitted to Westinghouse a special audit report, dated November 28, 1990. Exhibit Z to Westinghouse Memo. Assessing the validity of the anonymous allegations, the report concluded:

> Primary Allegation: Receivable balances are not sufficiently supported by underlying collateral values.
>
> Conclusion: No exceptions.
>
> Allegation: An independent appraisal for the ECJV property was suppressed because the resultant valuation was significantly less than the outstanding loan balance.
>
> Conclusion: No evidence to support allegation. Real estate management considered the appraiser's underlying assumptions inaccurate and unsupportable.

Memo at 1.

**19.** The anonymous communication was made in April, 1990. *See* Exhibit Z to Westinghouse

Allegation: Negative information was received from a Leventhal study that was "pushed aside by top management."

Conclusion: No evidence to support allegation.

Allegation: Underwriters are paid bonuses based on production.

Conclusion: Allegation does not raise concern; controls are reflected in the approval process to prevent abuse.

*Id.* at 2. The report then offered, in detail, "comments and recommendations to improve internal controls" addressing "some overall concerns" that the internal auditors had identified. *Id.* at cover and 2.

■■■■ The causes of action based on the allegations in ¶¶ 350–73 must be dismissed. Plaintiffs have not pled with particularity facts that would put defendants on notice of any claim of alleged fraud, and Fed.R.Civ.P. 9(b) is meant to foreclose precisely the sort of make-do pleading that this portion of plaintiffs' Complaint represents. WCC's internal auditors clearly denied the anonymous allegation that defendants' internal controls were inadequate. The fact that the internal auditors also recommended improvements in valuation methods and tighter standards for internal valuations does not support plaintiffs' claim that in its Form 10–Ks Westinghouse fraudulently or even inaccurately represented its internal controls as adequate "to provide reasonable assurance that assets are safeguarded and that the books and records reflect authorized transactions of the corporation." ¶ 351. Further, the allegations in the complaint that the internal controls were inadequate in fact do not even contradict Powe's statements in the annual reports that management was strengthening internal controls, much less permit an inference that Powe's statement was fraudulent. Plaintiffs may not cite confidential communications, policy recommendations and internal memoranda identifying measures by which Westinghouse could improve some area of operations and allege that the corporation had previously committed actionable fraud. Section 10(b) is designed to ensure full and accurate disclosure and may not be used to punish firms for identifying and implementing improvements to corporate policies.

### C. Section 10(b) and Rule 10b–5 Claim Against the Secondary Defendants

#### 1. Lazard Freres

The additional allegations against Lazard may be summarized as follows: (1) Lazard was retained to advise Westinghouse as to its options, ¶ 103 *et seq.;* (2) Lazard conducted a study; (3) Lazard executives Rohatyn and Wilson prepped Lego for the securities analysts meeting of October, 1990 using the Niemcyk memo and attached documents, Exhibit A to Compendium; and (4) Lazard drafted a document, the Question and Answer Memo, relative to proposals to restructure Westinghouse, including by taking a charge against 1990 earnings. ¶¶ 155–159.

Plaintiffs argue that by taking these actions (1) Lazard advised Lego "to mislead analysts by describing reserves as adequate because '[m]ost analysts are probably unaware of the full extent of the problem'," Plaintiffs' Brief at 18; and (2) Lazard prepared the Question & Answer Memo "which demonstrated its … awareness that the $975 million provision was inadequate to protect against likely losses in WCC's portfolio[,]" Plaintiffs' Brief at 18–19; and "effectively orchestrat[ed] a two-step write-down … by failing to disclose what, at best, was the highly contingent nature of the February 1991 write-down." *Id.* at 89.

■■■ Neither of the documents on which plaintiffs base their claim against Lazard will bear the construction placed on it. Nowhere in the Niemczyk memo is there any advice to "mislead analysts." The quotation, "most analysts are probably unaware of the full extent of the problem," is extracted by plaintiffs from a discussion of WCC's position which makes no recommendations:

WCC's earnings are under pressure. The most obvious problem is a high level of non-performing real estate. Most analysts probably are unaware of the full extent of the problem. This is because part of WCC's real estate owned (REO) is warehoused at the parent (WFSI) and also because WCC does not publicly disclose renegotiated or "less than carry" loans. To some extent, the level of non-perform-

ing assets can be managed by lowering interest rates and returning non-earning loans to performing status. The end result is the same—the overall yield of the portfolio declines, squeezing interest margins.

Exhibit A to Compendium at 1. The portion of the memo containing Lazard's proposed answer concerning loss reserves, designed to prepare Lego for analysts' questions, is set out in full: [20]

### Possible Questions

Is WCC considering a special charge to earnings to increase loan loss reserves? A restructuring charge?

### Possible Answers/Approach

We believe that our reserves are adequate at the present time. However, we continue to monitor the situation closely and will take whatever steps are necessary to maintain a strong credit profile.

We have no plans at present to take a restructuring charge. [Revise if appropriate for anticipated reductions in branch office staff.] We are undertaking a comprehensive review of our business and will be considering a range of options, [some of which might involve a restructuring charge]. This review is in an early stage and it would be premature to speculate at this time whether a restructuring charge is necessary or even desirable.

*Id.* at 7. The proposed answer regarding the adequacy of reserves, prepared only weeks after Lazard was retained, is rendered innocuous by the qualification: "However we continue to monitor . . . ." Further, there are no allegations in the Complaint that even Lego or the other Westinghouse defendants themselves *believed* at this point that the loss reserves were inadequate, only that the reserves were inadequate *in fact* and that Price Waterhouse, Lazard and the Westinghouse defendants were either aware of the facts that should have caused them to recognize

this inadequacy but did not, or were negligent or reckless in failing to provide internal controls adequate to discover the true state of affairs. *See* ¶ 182.

 Insofar as Lazard (or Price Waterhouse) is alleged to have failed to draw the proper conclusions from known facts, the claims are purely negligence allegations, not claims that Lazard participated with intent to bring about, *see Landy v. FDIC*, 486 F.2d at 163, Lego's unqualified statement. The claim that Lazard (or the other secondary defendants) provided insufficient internal controls to detect the true state of Westinghouse's affairs only weeks after being retained is also meritless.

 In fact, Lazard had flagged the issue of loss reserves in the Earnings Outlook portion of its report:

We believe Price Waterhouse (WCC's auditors) will challenge the adequacy of reserves and argue strongly for additional provisions in the fourth quarter.

Exhibit A to Compendium at 3.

No reasonable person could conclude from the language of this document (and plaintiffs allege no other actions on Lazard's part) that Lazard attempted to mislead the securities analysts, or aided and abetted Lego's alleged attempt to do so. In an attempt to state a claim against Lazard, plaintiffs allege that in the actual presentation to the analysts Lego "followed Lazard's recommended script precisely." ¶ 131. Simple comparison of Lazard's proposed answer and Lego's alleged actual statements reveals that this characterization is simply not supportable. Even at the pleading stage an allegation which is refuted by the document from which it is derived cannot support a cause of action. The allegation in ¶ 131 that Rohatyn, Wilson and Niemczyk believed that Lego's statements to the analysts were false when made still does not satisfy the requirements for a cause of action against Lazard because La-

---

**20.** Lazard had previously cautioned Westinghouse in the overview section of the memo entitled "Recommended 'Script' for the Analysts Meeting:"

There are enough uncertainties in the outlook not to discount the possibility of quarterly loss-

es or a step decline in earnings. An overly optimistic assessment of WCC, followed soon after by disappointing earnings, could seriously damage Lego's credibility.

Exhibit A to Compendium at 3.

zard neither made nor counselled making these statements.

█ In ¶ 136, plaintiffs allege that Lazard recommended that Westinghouse release its fourth-quarter 1990 earnings results without disclosing any of Lazard's acquired knowledge concerning WCC's troubled real estate loans or the allegedly planned charge against income. Plaintiffs base this allegation on a document entitled "Westinghouse Financial Services: Discussion Materials," dated January 9, 1991. Exhibit B to Compendium. The Discussion Materials likewise simply cannot bear the construction placed on them, for there are literally no recommendations at all in the document, and the only mention of a charge against income is posed as an alternative strategy option: "Choose between one-time restructuring charge versus pay-as-you-go alternative." Exhibit B at 4.

█ However, even if Lazard recommended a charge against income to the Westinghouse board, plaintiffs' allegations would not state a cause of action, because Lazard had no duty to disclose its recommendation to the marketplace of investors.[21]

█ Finally, plaintiffs attempt to state a Section 10(b) claim directly against Lazard based on the May 1991 stock offering by arguing in their brief that Lazard orchestrated a two-step write-down—i.e. advised Westinghouse to take the February 1991 write-down knowing that the $975 million charge was inadequate. Plaintiffs' allegations bely their conclusions. Plaintiffs' allege at ¶ 145, that Lazard completed a Model Plan calling for a $1.0 billion–$1.2 billion charge to increase the loan loss reserves, that Westinghouse management decided on a $975 million charge, ¶ 148, and that Lazard Freres prepared the Board Meeting Q & A which stated that the $975 million charge was, in Lazard Freres's opinion, "clearly reasonable but at the low end of the range," was based on an unstable economic environment, and was contingent on the success of disposing of WCC assets. ¶ 157. These documents are the only basis for plaintiffs' claim against Lazard. *See* ¶ 158. Plaintiffs make additional allegations concerning Lazard's knowledge at ¶ 182–83, but the allegations simply are not relevant to a securities fraud claim. At ¶ 182, plaintiffs allege that Lazard knew as of the February 27, 1991 board meeting "that the conditions which Lego cited [in ¶ 181] for the [$1.68 billion charge] in October of 1991 existed." That much is not even in dispute. Asserting Lazard's knowledge that the economy was weak, the real estate credit market was weak, and the market for commercial properties was weak is in no way equivalent to asserting that Lazard was responsible for Westinghouse's February 1991 $975 million charge knowing that it was inadequate, and planning an undisclosed second charge for October 1991.

### 2. *Price Waterhouse*

Price Waterhouse was Westinghouse' independent accountant during the class period, and as auditor expressed its unqualified opinions on the financial statements of Westinghouse, WFSI, and WCC in 1988, 1989, and 1990. ¶ 14. The unqualified opinions were published in Westinghouse and WCC's 1988, 1989, and 1990 Form 10–Ks. The 1990 financial statements were also referenced in the prospectus for the May 1991 stock offering by Westinghouse.

Additionally, Price Waterhouse reported to the Westinghouse board of directors' Audit Review Committee on January 23, 1991, and audited the adequacy of the February 1991 charge.

Plaintiffs allege that Price Waterhouse violated Section 10(b) and Rule 10b–5 by certifying in each of these financial documents that Price Waterhouse's audits were conducted in accordance with GAAS and that the statements were prepared in conformity with GAAP, even though Price Waterhouse violated GAAS as alleged in ¶ 351, ¶¶ 365*–69*, ¶¶ 374–88.

---

21. To accept plaintiffs' allegations as sufficient to state a cause of action for securities fraud would imply that whenever a company or its financial consultants identified a charge against income as a possible course of action, all reports of earnings by that company must be suspended until the decisions about whether to take a charge against income and if so, in what amount, have been finalized.

Plaintiffs, in addition to the allegations based on the documents, allege that Price Waterhouse "agreed to maintain reserves at a capped 2.5% (later increased to a grossly inadequate 2.8%) despite known massive increases in problem loans," see ¶ 77–90, and "participated in the scheme to defraud by recklessly disregarding the lack of internal controls, failing to obtain sufficient competent evidential matter, failing to broaden the scope of its audit where circumstances required, and failing to maintain independence," See ¶ 371*; see generally Plaintiffs' Brief at 19.

Plaintiffs do not allege that Price Waterhouse expressed any opinions or was retained or consented to render opinions in any other public disclosures. See ¶¶ 137–62. Nor do plaintiffs allege that Price Waterhouse was party to Lazard's review of Westinghouse's options in late 1990, nor in the Westinghouse board of directors' decision to take the $975 million charge. Finally, plaintiffs do not allege that Price Waterhouse was involved in or commented on the $1.68 billion charge taken in October, 1991.

■ Plaintiffs' claim that Price Waterhouse's unqualified opinions on Westinghouse's financial statements in the class period directly violate Section 10(b) and Rule 10b–5 are sufficient to state a claim at this stage of the proceedings. Plaintiffs must allege, in order to state a direct claim, that Price Waterhouse knowingly or with reckless indifference made a false statement of material fact intending to induce the plaintiffs' reliance thereon. Lewis v. Chrysler Corp., 949 F.2d at 649. It is not actionable that a financial statement is incorrect or even that the party audited is committing a fraud which the auditor does not detect, because the expression of the auditor's opinion does not make the auditor an insurer of every investor who purchases in reliance on the financial statement.

Nevertheless, the Court of Appeals has approved, although in a distinguishable procedural context, liability based on allegations that an auditing firm misrepresented its adherence to GAAS. See Bradford–White Corp. v. Ernst & Whinney, supra.

■ Measured by the pleading standards of Rule 9, however, the complaint is inadequate to state any cause of action against Price Waterhouse for aiding and abetting. Plaintiffs' aiding and abetting allegations, for example that Price Waterhouse "agreed" that WCC's loss reserves would be 2.5%, see ¶ 80, and "approved" an inadequate level of loss reserves so that the individual Westinghouse defendants could garner performance bonuses, ¶ 90, are inherently improbable as a matter of fact and insufficient as a matter of law. In the absence of any allegation that would support an inference that Price Waterhouse had either the legal power or a factual incentive to agree to or approve loss reserves, plaintiffs' aiding and abetting claim is based on two allegations: (1) that Price Waterhouse received fees from Westinghouse, ¶ 78, and that it acted as CFO of Brad Cable at the time of some of its audits, ¶ 405.

■ Accounting firms do not offer their services to large corporations gratis, and there is nothing improper in Price Waterhouse receiving fees for its services. Nevertheless, a different situation might be presented if plaintiffs alleged that Price Waterhouse's compensation was well above the market rate or that it was somehow bartered for a favorable opinion. Paragraph 78 makes no such allegations, and adds nothing to plaintiffs' other allegations.

■ The allegation that Price Waterhouse's audit integrity was compromised because it was also acting as CFO of Brad Cable is also rejected. Regulation S–X requires an accountant's independence, but considers independence to be impaired only by a "direct financial interest" or a "material indirect financial interest." 17 C.F.R. § 210.2–01(b). Price Waterhouse's alleged indirect financial interest in Brad Cable is, on the facts alleged, immaterial as a matter of law.

## VI. COUNTS TWO, THREE, FOUR and FIVE

### A. Westinghouse Defendants

■ In order to state a claim under Sections 11 and 12(2), plaintiffs need only allege that they acquired a security which

was accompanied by a registration statement, any part of which contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, regardless of scienter. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). Allegations of § 11 and § 12(2) violations that sound in fraud must be pled with the particularity required by Rule 9(b). *Shapiro,* 964 F.2d at 287.

In ¶¶ 423–466, plaintiffs allege that all defendants including the individual defendants, violated Sections 11, 12(2) and 15 of the Securities Act by making misrepresentations of fact in the registration statement and prospectus filed with the SEC on April 18, 1991 in connection with the May 1991 public offering, and by offering or selling Westinghouse securities by the use of a misleading prospectus. Specifically, plaintiffs aver that the registration statement and prospectus misrepresented Westinghouse's earnings, assets, net worth and loan loss reserves. Plaintiffs also aver that Westinghouse falsely predicted in its prospectus that the restructuring plan announced February 27, 1991 would "reduce risk and improve the financial position and results of operations of WFSI and WCC in future periods," and that "management believe[d] that under current economic conditions [WFSI's valuation allowances] should be adequate to cover future losses that may occur." ¶ 432. Finally, plaintiffs allege that Westinghouse's 1990 Form 10–K annual report, referred to in the prospectus, contained false statements about the adequacy of Westinghouse's loan loss reserves and internal controls, misleading characterizations about the February 27, 1991 restructuring, and falsely represented that, "Management believes that, under current economic conditions, the allowance for losses at December 31, 1990 will be adequate to cover future losses that may develop in the various portfolios." ¶ 433.

### 1. *Control Person Liability*

Plaintiffs' claims against the individual defendants are premised upon the allegation that Messrs. Lego, Stern, Hollinshead, Faust, Powe and Pugliese were "controlling persons," pursuant to Section 15 of the Securities Act. Section 15 defines "controlling person" as every person who "controls any person liable under section 11 or 12...." 15 U.S.C. 77o (1988). The Securities and Exchange Commission defines "control" in this context as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2. In *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890–91 (3d Cir.1975), the United States Court of Appeals for the Third Circuit stated that "heavy consideration" is given "to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." The court held that a person who owned fifty per cent of the outstanding stock, was Chairman, CEO and President of the company, and ran the day-to-day business activities was a "controlling person." *Id.* at 891.

None of the individual defendants in the instant matter bear as many incidents of control as did the defendant in *Rochez Bros.;* they are each, however, "controlling persons." Each of the individual defendants is alleged to have possessed the power, or the potential power, to control the activities of Westinghouse and/or WFSI and WCC. ¶¶ 9, 11. At the motion to dismiss stage, such alleged influence, even "short of actual direction," is sufficient to make one a controlling person, *see Gould v. American–Hawaiian S.S. Co.,* 535 F.2d 761, 779 (3d Cir.1976). The ultimate question "[w]hether a defendant is a controlling person within the meaning of federal securities law is a question of fact," and may therefore be raised again in a motion for summary judgment. *See Wiley v. Hughes Capital Corp.,* 746 F.Supp. 1264, 1283 (D.N.J.1990) (*citing In re Worlds of Wonder Securities Litigation,* 694 F.Supp. 1427, 1435 (N.D.Cal.1988)).

### 2. *Rule 12(2) "Offers or Sells" Requirement*

The Westinghouse Defendants argue that Counts Three and Five should be dismissed as to them because plaintiffs have not pled facts demonstrating that the Westinghouse

defendants offered or sold securities, an essential element of any claim under Section 12(2) of the Securities Act.[22] In ¶¶ 442 and 461, plaintiffs allege in wholly conclusory terms that defendants "were sellers of Westinghouse securities within the meaning of Section 12(2) of the Securities Act and either sold or promoted the sale of said securities directly to plaintiffs and other Class members or solicited plaintiffs and other Class members to buy such securities." Relying on the Third Circuit Court of Appeals' holding on this issue in *Craftmatic*, 890 F.2d at 637, plaintiffs argue that their legal conclusion, *unsupported by any allegation of fact*, establishes that the Westinghouse defendants, acting out of their own financial interests, either sold, or solicited the purchase of, Westinghouse securities as part of the May 19, 1991 public offering.

■ The Supreme Court in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), held that § 12(1) liability extends both to sellers and to those who solicit securities purchases, motivated by their own or the securities owners's financial interests. *Id.* at 642–47, 108 S.Ct. at 2076–78. The *Craftmatic* court, applying the rule from *Pinter*, to Section 12(2) claims, 890 F.2d at 635, held that an issuer who itself sold nearly two-thirds of an initial public offering of common stock, *Craftmatic*, 890 F.2d at 630, was not immunized from § 12 liability.

In *Craftmatic*, the plaintiffs alleged that: Each of the defendants ... either sold said securities directly to plaintiffs ... or solicited plaintiffs ... to buy Craftmatic common stock ... and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the owner[s] of Craftmatic securities, and they ... conspired with and aided and abetted one another in connection with the preparation of the false and misleading Prospectus and Registration Statement

used in conjunction with the sale of Craftmatic securities.

*Id.* at 637. The court found "that plaintiffs' claim that the Craftmatic defendants were 'sellers' for purposes of § 12(2) is sufficient to survive a Rule 12(b)(6) motion to dismiss." *Id.* at 637. The operative word in the *Craftmatic* plaintiffs' complaint was "sold," because it accurately described the facts underlying that case. Instantly, plaintiffs [23] have not alleged that the Westinghouse defendants in fact sold or solicited the purchase of Westinghouse securities, but attempt nonetheless to analogize their allegations to the allegations and holding in *Craftmatic* by pointing to the similarity of language employed. Plaintiffs' Memorandum at 95 n. 44. But *Craftmatic* does not stand for the proposition that a Section 12(2) plaintiff states a claim simply by repeating the *Craftmatic* plaintiffs' allegations, or that a plaintiff can avoid alleging facts that would support a legal conclusion, viz., that defendants were statutory offerors or sellers, by pleading the legal conclusion itself. The conclusory allegation that defendants sold or solicited the purchase of securities will withstand a motion to dismiss only if accompanied by allegations of *fact* that defendants did sell or solicit the purchase of securities.

■ Plaintiffs' have not alleged that the Westinghouse and individual defendants sold or solicited the purchase of Westinghouse securities. Instead, plaintiffs allege that the defendants "aided and abetted one another in connection with the preparation of the false and misleading Registration Statement/Prospectus and documents incorporated therein by reference and used in conjunction with the sale of Westinghouse securities to plaintiffs and members of the Class." ¶¶ 442, 461. This allegation does not state a claim under Section 12(2). The *Craftmatic* court specifically held that "persons who fail to qualify as sellers under the *Pinter* standard may not be held liable under § 12(2) on an aiding and

---

22. Section 12(2) provides in part:
 Any person who offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact ..., and who shall not sustain the burden of proof that he did not know, and in the exercise of

reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him.... 15 U.S.C. § 77*l* (1981).

23. Excluding Donald McLennan and Ruth Stepak, the DRP plaintiffs, *see* ¶¶ 449, 459.

abetting theory." *Craftmatic*, 890 F.2d at 636.

■ The only remaining question, then, is whether "preparation of [a] false and misleading Registration Statement/Prospectus and documents incorporated therein by reference used in conjunction with the sale of ... securities" brings one within the scope of a Section 12 seller. *Pinter* and *Craftmatic* are clear on this point: absent "direct and active participation in the solicitation of the immediate sale," an issuer is not "liable under § 12(2) solely on the basis of its involvement in preparing the prospectus." 890 F.2d at 636. *See Pinter*, 486 U.S. at 651, 108 S.Ct. at 2080 ("[Section] 12's failure to impose express liability for mere participation in unlawful sales transactions ·suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale"). Thus, preparation of financial statements and prospectuses, a requirement of any stock issue, *see* Section 7 of the Securities Act, 15 U.S.C. § 77g; *see also* Securities and Exchange Commission Form S–3, are not considered part of the solicitation process, which is, as the Fifth Circuit has noted, akin to an intensive marketing campaign to convince the public to buy a product. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1114 n. 8 (5th Cir.1988), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989).

### 3. *The Bespeaks Caution Doctrine*

■ When considering whether a claim has been stated under Sections 11 and 12(2) for false and misleading statements in a registration statement or prospectus, courts are not limited to the quotations and allegations contained on the face of the complaint, and can examine the registration statement and prospectus themselves. *See I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991); *In re Donald J. Trump Casino Securities Litigation*, 793 F.Supp. at 546 n. 1. Westinghouse's May 9, 1991 prospectus, Exhibit Q to Westinghouse Memo, issued approximately one week before the public offering, "virtually bristles with warnings" about Westinghouse's competitive position, and more importantly, about the risk of further deterioration in real estate markets (information which, this Court judicially notes, was widely reported and generally known to the investing public, *see In re Donald J. Trump Casino Securities Litigation*, 793 F.Supp. at 562), which could (1) negatively affect Westinghouse's ability to sell assets under its restructuring plan, and (2) strain the adequacy of WFSI's loan loss reserves.

With respect to WFSI's competitive status, Westinghouse disclosed in the prospectus that:

> The Financial Services group operates in a highly competitive environment. Commercial finance companies, commercial banks, leasing companies and other financial institutions compete in varying degrees in the several markets in which WFSI does business. In view of the market fragmentation resulting from numerous local and regional competitors, it is not possible to provide a meaningful description of the group's competitive position to individual markets. Its activities are also subject to a variety of federal and state regulations.

Exhibit Q at 6.

Westinghouse's statements concerning the adequacy of its February 27, 1991 restructuring plan, and reclassification of assets as being held for sale or restructuring, and of its loan loss reserves, are among the strongest warnings in the entire record:

> As part of the reclassification of $3.4 billion of assets, the Company reclassified for sale approximately $654 million of marketable securities. In accordance with its decision to liquidate this portfolio, the Company recognized a special provision of $163 million in addition to the $15 million pre-existing valuation allowance. This $178 million valuation allowance reflects the difference between the cost of those investments and their estimated market values as of December 31, 1990. This portfolio will be liquidated as soon as practicable; however, *future deterioration in market value could result in additional losses prior to sale and appreciation, if any, in market values will not be recognized currently.* At March 31, 1991, the difference between the cost and estimated

market values of the marketable securities was approximately $130 million, reflecting improved conditions in the markets for high-yield securities.

The $3.4 billion in higher-risk and underperforming assets reclassified as held for sale or restructuring included $2.4 billion in receivables. As such, *these receivables had and continue to have a high probability of becoming non-earning assets during the expected period of liquidation.* Although changes in these assets between earning, reduced earning, non-earning or real estate owned have occurred since December 31, 1990, management does not believe that such changes have had a material effect on the net realizable value of these receivables.

\*　　\*　　\*　　\*　　\*　　\*

At March 31, 1991, WFSI's valuation allowances related to assets held for sale or restructuring, and the allowances for credit losses related to the assets in the ongoing portfolio, amounted to $1,013 million and $306 million, respectively. *Management believes that under current economic conditions such allowances should be adequate to cover future losses that may occur. However, a further or more prolonged downturn in the economy or in the real estate, securities or certain other markets could have a negative effect on the ability of WFSI's borrowers to repay and on asset values generally and could result in additional increases in non-earning assets, restructured loans and, ultimately, increases in allowances for losses in both assets held for sale or restructuring and receivables in the balance of WFSI's portfolio.*

*Id.* at 8–9 (emphasis added).

Westinghouse's statement about the sufficiency of its reserves is remarkably equivocal. The statement that "[m]anagement believes that under current economic conditions such allowances *should* be adequate to cover future losses that may occur" is even less confident than Westinghouse and WCC's similar representations about the adequacy of loan loss reserves in prior annual reports. In its Form 10–K for the financial year ended December 31, 1990, Westinghouse stated:

"Management believes that, under current economic conditions, the allowance for losses at December 31, 1990 *will* be adequate to cover future losses that may develop in the various portfolios." Exhibit M to Westinghouse Memo at 19 (emphasis added). WCC's Form 10–K for the same year stated: "A special provision for losses of $925 million was recognized in the fourth quarter of 1990 to reflect the decline in estimated realizable value of affected assets. Management believes that this change in strategy *will* reduce portfolio risk and improve Westinghouse Credit's future financial position and results of operations." Exhibit N to Westinghouse Memo at 9 (emphasis added). In light of these relatively confident declarations, which were themselves qualified by additional language that bespoke caution, the replacement of the word "will" with "should" in Westinghouse's May 9, 1991 prospectus (prepared within two months of the 1990 Form 10–Ks) could only have been interpreted by the hypothetical reasonable investor as a step in the direction of greater caution.

If that were not enough, Westinghouse went on to spell out exactly what result might follow from a "prolonged downturn in the economy" generally, or in a comprehensive list of markets, including the real estate, securities, or "certain other" markets: WFSI's borrowers might default on their loans, which "could result in additional increases in non-earning assets, restructured loans, and ultimately increases in allowances for losses in both assets held for sale or restructuring and receivables in the balance of WFSI's portfolio." Exhibit Q at 9. This straightforward language communicated a clear caveat about the future adequacy of Westinghouse reserves. Such disclosures are precisely what the federal securities laws are designed to produce, for they remove any misleading effect more positive statements about company performance may have. Accordingly, Counts Two, Three, Four and Five, plaintiffs' claims under Sections 11 and 12(2) against the Westinghouse defendants, as well as against the individual defendants pursuant to Section 15 of the Securities Act, will be dismissed with prejudice.

### B. *Secondary Defendants*

Lazard, Shearson Lehman Brothers, Inc.; Lehman Brothers International, Ltd; Goldman Sachs & Co.; Goldman Sachs International, Ltd.; Lazard Brothers & Co., Ltd; and the unnamed proposed class of underwriter defendants' motions to dismiss Counts Two through Five will also be granted. Little additional discussion is necessary.

In Count Two, plaintiffs allege that they acquired securities in the May 1991 public offering accompanied by a prospectus and registration statement that contained untrue statements of material fact. *See* ¶¶ 430–434. Comparison of those statements with those in the sections of the Complaint alleging causes of action under Section 10(b) and Rule 10b–5 reveals that the bases for the Section 11 claims are virtually the same as the Section 10(b) claims. Pursuant to Section 11(a)(5), these would state a prima facie case against "every underwriter with respect to such security," except that as discussed above, Part VI.A, the statements alleged to be actionable are accompanied by statements bespeaking caution.

In Count Three, plaintiffs must allege, to state a viable Section 12(2) cause of action, that the underwriter defendants were "sellers" within the meaning of Section 12(2). That is, there must be an allegation that a particular proposed defendant sold or solicited the sale of Westinghouse securities to the individual plaintiffs. *Pinter v. Dahl*, 486 U.S. at 643–47, 108 S.Ct. at 2076. This element is lacking. Plaintiffs may not rely on what in other contexts might be called market share liability. *See e.g. City of Philadelphia v. Lead Industries Association, Inc.*, 994 F.2d 112 (3d Cir.1993). Nor may the plaintiffs rely on the underwriter defendants' alleged aiding and abetting of one another, to attribute the actions by one defendant to all other defendants. *See Craftmatic*, 890 F.2d at 635–37.

In short, an additional deficiency of Count Three as to the proposed underwriter class is that plaintiffs attempt to bring a plaintiff's class action against a proposed class of defendants without alleging facts which would establish standing by a plaintiff against each defendant. Plaintiffs cite district court decisions from California dispensing with the requirements of standing, but in this circuit it is established that before the question of class status can be addressed there must be a representative plaintiff who alleges sale or solicitation by each proposed defendant. *Haas v. PNB*, 526 F.2d 1083, 1096 n. 18 (3d Cir.1975) *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (3d Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971).

## VII. *COUNT SIX*

### A. *Westinghouse Defendants*

In ¶¶ 467–71, plaintiffs base a claim for negligent misrepresentation under Pennsylvania common law on allegations that "defendants negligently misrepresented ... that Westinghouse had adequately reserved against under-performing assets, that the book value of Westinghouse accurately reflected its financial condition, and also failed to disclose the fact that Westinghouse had not established adequate reserves for its underperforming or non-performing assets." ¶ 469.

Defendants argue that plaintiffs' claim for negligent misrepresentation must be dismissed where there is no allegation of contractual privity between plaintiffs [24] and the Westinghouse defendants. Contractual privity is not required under Pennsylvania law. *Eisenberg v. Gagnon*, 766 F.2d at 779–80; *Wilder v. Williams*, 1989 WL 67821 (W.D.Pa.1989). In Pennsylvania, negligent misrepresentation is a tort, the elements of which are set forth in the Restatement (Second) of Torts § 552, *see Eisenberg v. Gagnon*, 766 F.2d at 778; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 615 (3d Cir.1987), which provides in relevant part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the

---

**24.** Defendants do not dispute contractual privity between Donald McLennan and Ruth Stepak, the DRP plaintiffs, and Westinghouse. *See* Westinghouse Memo at 48.

guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) [T]he liability stated in subsection (1) is limited to loss suffered

 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

 (b) through reliance upon it in a transaction that he intends the information to influence or know that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552.

■■■■ Defendants, relying principally upon *In re Delmarva Securities Litigation,* 794 F.Supp. 1293 (D.Del.1992), argue that plaintiffs' claim for negligent misrepresentation must be dismissed because the class of potential claimants is not "a limited group of persons for whose benefit" the allegedly misleading information was intended. Westinghouse Memo at 48–9. I agree with Judge Schwartz' reasoning in *In re Delmarva Securities:* imposing liability upon the Westinghouse defendants for their allegedly negligent misrepresentations in the SEC forms would, in the words of Judge Cardozo in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 189, 174 N.E. 441, 448 (1931), subject them to "potential liability in an indeterminate amount for an indeterminate time to an indeterminate class," contrary to the language and intent of Section 552(2). Public disclosures made in SEC reports are representations made not to a specific, limited group of persons, but to the world at large. Where a corporation does not and cannot know the identity of the recipients of its disclosures at the time those disclosures are made, liability

under Section 552(2) does not obtain. *See also In re Par Pharmaceutical, Inc. Securities Litigation,* 733 F.Supp. 668, 686 (S.D.N.Y.1990).

■■■■ Plaintiffs argue that the defendants' negligent misrepresentation liability is based upon Section 552(3), which creates an exception to the limitation of Section 552(2) where the defendant is under a public duty to supply the information in question. Subsection (3)'s broader scope of liability "may apply to private individuals or corporations who are required by law to file information for the benefit of the public." *See* Comment k to Section 552(3). Public corporations are certainly required by law to file information for public benefit, but application of Section 552(3) to alleged misrepresentations in public corporations' SEC reports would threaten such firms with the prospect of liability to an almost unlimited class of persons: all potential investors in the firm's stock. This position requires an assumption about the Restatement drafters' view of liability that one federal district court has disapprovingly termed "extraordinary," *see In re Crazy Eddie Securities Litigation,* 812 F.Supp. 338, 359 (E.D.N.Y.1993), and that another (the only other reported decision on point) rejected outright. *See In re Delmarva Securities Litigation,* 794 F.Supp. at 1310–11. Lacking any indication that Pennsylvania courts would adopt so expansive a basis of corporate liability, this Court will decline to impose negligent misrepresentation liability upon the Westinghouse defendants under Restatement (Second) of Torts. § 552(3). Because plaintiffs lack standing to make a state law claim for negligent misrepresentation under both Restatement (Second) of Torts §§ 552(1) and 552(3), Count Six will be dismissed with prejudice.

### B. *Secondary Defendants*

■■■■ Plaintiffs assert that Lazard, Price Waterhouse and the underwriters are liable to them for any negligent misrepresentations made either in the financial statements or in the registration statement for the May 1991 public offering. Plaintiffs do not allege that Lazard, Price Waterhouse, or the underwriters made representations to them individual-

ly. Nor do plaintiffs allege reliance on any particular representation or on the prospectus or registration statement as a whole. The fraud on the market theory has never been made applicable to a common law claim of negligent misrepresentation, and it is not reasonable to predict that Pennsylvania's Supreme Court, which has adopted Restatement of Torts (Second) § 552(1)'s requirement that the loss be caused by "their justifiable reliance upon the information" would so weaken the causation requirement.

■ Plaintiffs argue that liability for common law misrepresentation is alleged under Subsection 552(3) because "each of the defendants here is under a public duty to give information to the class of plaintiffs before this Court." Plaintiffs' Brief at 104. That is an overstatement of the law. Westinghouse is under a public duty imposed by the Securities Act and Securities Exchange Act to provide information to shareholders, and in the case of the May 1991 public offering, to prospective shareholders. The disclosure of information by Westinghouse's investment banker, accountant, and underwriters, however, is purely a matter of contract between Westinghouse and Lazard, Price Waterhouse, or the underwriters, not a public duty. Liability against the secondary defendants therefore cannot be premised upon subsection (3). *See In re Crazy Eddie Securities Litigation*, 812 F.Supp. at 359.

■ Plaintiffs' claim of negligent misrepresentation against the underwriter defendants must also be dismissed for lack of subject matter jurisdiction. There are no federal claims against the underwriter defendants to which any tort claims could be pendent. Even assuming that diversity exists in the case of the claims of any of the named plaintiffs against any of the defendants, there is no allegation that the jurisdictional threshold is met, nor is it likely that it could be. *See generally Packard v. Provident Mutual Bank*, 994 F.2d 1039 (3d Cir.1993). It is therefore unnecessary to address further any questions of standing or the sufficiency of the allegations as to this cause of action against the underwriters.

*ORDER*

AND NOW, this 27th day of July, 1993, in accordance with the foregoing Opinion, plaintiffs' Consolidated Amended Class Action Complaint (Docket No. 84) is dismissed. Count One, is dismissed without prejudice to repleading. Counts Two, Three, Four, and Five are dismissed with prejudice. Count Six is dismissed with prejudice as to the Westinghouse defendants, Lazard, Freres & Co., and Price Waterhouse, and dismissed for lack of subject matter jurisdiction as to the underwriter defendants without prejudice to proceeding pursuant to 42 Pa.C.S. § 5103(b).

Plaintiffs' Second Amended Complaint shall be filed on or before August 20, 1993. Because, as stated in the foregoing opinion, some of plaintiffs' causes of action are sufficient to withstand a motion to dismiss, the stay of discovery previously ordered in this matter is dissolved. For clarity's sake, however, the defendants need not respond to the allegations of the Complaint until the Second Amended Complaint is filed.